998 F.2d 824
 84 Ed. Law Rep. 650
 Jennifer ROBERTS; Julie Osborne; Janet Brumbelow; Laura
Bielak; Sara Stout; Amy Recouper; Jennifer Jacobs; Malia
Kuenzli; Stacie Stafford; Heather Nakasone; Kim Johnson;
Aimee Rice; Lisa Mize, Plaintiffs-Appellees,
v.
COLORADO STATE BOARD OF AGRICULTURE, in its capacity as the
entity charged with the general control and
supervision of Colorado State
University, Defendant-Appellant.
Colorado State University, Defendant.
Jennifer ROBERTS; Julie Osborne; Janet Brumbelow; Laura
Bielak; Sara Stout; Amy Recouper; Jennifer Jacobs; Malia
Kuenzli; Stacie Stafford; Heather Nakasone; Kim Johnson;
Aimee Rice; Lisa Mize, Plaintiffs-Appellees,
v.
COLORADO STATE BOARD OF AGRICULTURE, in its capacity as the
entity charged with the general control and
supervision of Colorado State
University, Defendant-Appellant.
 Nos. 93-1052, 93-1086.
 United States Court of Appeals,
Tenth Circuit.
 July 7, 1993.
 
 Timothy M. Tymkovich, Sol. Gen. (Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Paul Farley, Deputy Atty. Gen., Antony B. Dyl, First Asst. Atty. Gen., and William E. Thro, Asst. Atty. Gen., with him on the briefs), State of Colo., Denver, CO, for defendant-appellant.
 John M. Kobayashi (Pamela A. Gagel and Karen E. Robertson, also of Kobayashi & Associates, Denver, CO, and Ellen J. Vargyas, National Women's Law Center, Washington, DC, with him on the brief), for plaintiffs-appellees.
 Martin D. Schneiderman, Linda S. Stein, and Holly K. Kulka of Steptoe & Johnson, and Arthur H. Bryant of Trial Lawyers for Public Justice, Washington, DC, filed an amicus curiae brief on behalf of the Trial Lawyers for Public Justice and the National Ass'n for Girls and Women in Sport.
 Before McKAY, Chief Judge, LOGAN and ANDERSON, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 The Colorado State Board of Agriculture (SBA or defendant)[1] appeals the decision of the district court finding that it violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and ordering it to reinstate the women's fast pitch softball team at Colorado State University (CSU) with all of the incidental benefits of a varsity team.
 
 
 2
 Plaintiffs, CSU students and former members of the fast pitch softball team, brought suit in their individual capacities[2] against SBA and CSU in June 1992 after CSU announced that it was discontinuing the varsity fast pitch softball program. In February of this year the district court found that SBA and CSU had violated Title IX, and issued a permanent injunction reinstating the softball program. Approximately three weeks later, the district court held a status conference and, in the face of apparent foot-dragging by defendant, amplified its earlier orders to require defendant to hire a coach promptly, recruit new members for the team, and organize a fall season. This court denied a motion for a stay but expedited the appeal.
 
 
 3
 Plaintiffs first contest our jurisdiction to hear these appeals. On the merits, defendant contends that the district court erred in finding a Title IX violation. Defendant also maintains that even if the verdict was correct, the district court abused its discretion when it ordered reinstatement of the softball team and required defendant to follow specific directions in effecting that reinstatement rather than affording defendant the opportunity to present a plan that would bring it into compliance with Title IX.
 
 
 4
 We review a district court's interpretations of law de novo, Eastman Kodak Co. v. Westway Motor Freight, 949 F.2d 317, 319 (10th Cir.1991), and its findings of fact for clear error. Mid-America Pipeline v. Lario Enters., 942 F.2d 1519, 1524 (10th Cir.1991). We review a district court's choice of equitable remedies for abuse of discretion. Keyes v. School Dist. No. 1, 895 F.2d 659, 665 (10th Cir.1990), cert. denied, 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991).
 
 
 5
 * We consider first the challenges to our jurisdiction over these appeals. Plaintiffs maintain that because defendant failed to name CSU as a party in its notice of appeal, and because parties seeking appellate review must join all of their co-plaintiffs or co-defendants, we must dismiss this appeal. There is no substance to plaintiffs' argument that SBA cannot appeal the district court's decision without joining CSU as its co-appellant. This archaic practice of summons and severance was abolished by original Civil Rule 74 in 1937, see 9 James W. Moore et al., Moore's Federal Practice p 203.27 (1993), and was "assumed to be sufficiently obsolete as no longer to require pointed abolition" when the Federal Rules of Appellate Procedure were adopted. Fed.R.App.P. 3 advisory committee's note (1967 adoption).
 
 
 6
 CSU, not having been named in the notice of appeal, is not a party to the appeal. See Torres v. Oakland Scavenger Co., 487 U.S. 312, 314, 108 S.Ct. 2405, 2407, 101 L.Ed.2d 285 (1988). The real question, however, is whether SBA, which is named, is the proper party appellant to require us to reach the merits of the issues raised. Plaintiffs argue that because CSU has not appealed, the district court's order is final and enforceable against it, and SBA's appeal is irrelevant. In light of the statutory scheme creating SBA and CSU, however, CSU is powerless to comply with the district court's order on its own, and the relief plaintiffs seek may only be obtained against SBA. The Colorado legislature established CSU and SBA as separate entities, Colo.Rev.Stat. §§ 23-30-101, 23-31-101. While SBA was constituted as "a body corporate, capable in law of suing and being sued," id. § 23-30-102, the statutes and constitutional provisions pertaining to CSU contain no similar grant. See id. §§ 23-31-101 to -136; Colo. Const. art. VIII, § 5(1). Furthermore, although CSU maintains control over certain internal institutional policies, see, e.g., Colo.Rev.Stat. § 23-31-104 (faculty and board together determine curriculum); id. § 23-31-114 (faculty establishes rules of governance and discipline), SBA has general control and supervisory power including "power to adopt ... regulations ... to secure the successful operation of the university," id. § 23-31-108, hiring authority, id. § 23-31-109, and complete financial control over CSU, id. § 23-31-120; Colo. Const. art. VIII, § 5(2); see also Lewis v. State Bd. of Agriculture, 138 Colo. 540, 335 P.2d 546, 550 (1959). Under this scheme, even if CSU were capable of being sued, any adverse verdict or remedial order entered against CSU concerning hiring or funding would have to operate against SBA. Thus, CSU was an unnecessary party to the suit to begin with, and we see no legal impediment to reaching the merits with only SBA as appellant.
 
 
 7
 Plaintiffs also dispute SBA's right to appeal separately the measures ordered at the March 1993 status conference. Defendant counters with an argument that because it had appealed the injunctive order the district court was divested of jurisdiction to make any change in the injunction. We are satisfied that we have jurisdiction to review the measures ordered at the status conference either through defendant's appeal of the original jurisdiction order or its separate appeal of the specific obligations imposed at the March hearing. The district court refused a stay of the injunction, and this court also refused a stay pending appeal. The district court's injunction required it to supervise a continuing course of conduct. Absent a stay "an appeal from the supervisory order does not divest the district court of jurisdiction to continue its supervision." Hoffman v. Beer Drivers & Salesmen Local Union No. 888, 536 F.2d 1268, 1276 (9th Cir.1976). See also NLRB v. Cincinnati Bronze, Inc., 829 F.2d 585, 588 (6th Cir.1987). Indeed, Fed.R.App.P. 8(a) expressly recognizes this continuing power of a district court as it requires an application for an order "modifying ... an injunction during the pendency of an appeal" to be made in the first instance to the district court. See also Fed.R.Civ.P. 62(c) (district court may modify injunction during pendency of an appeal).
 
 
 8
 In light of the district court's continuing authority, if the specific directives imposed at the March status conference amount to "modifying" the injunction, they are subject to appeal under the express terms of 28 U.S.C. § 1292(a)(1). If they merely implement the original injunctive order or "clarify" it, they are not separately appealable. See Motorola, Inc. v. Computer Displays Int'l, 739 F.2d 1149, 1155 (7th Cir.1984) (An order is a clarification if it "does not change the parties' original [legal] relationship, but merely restates that relationship in new terms."); Mikel v. Gourley, 951 F.2d 166, 169 (8th Cir.1991); Sierra Club v. Marsh, 907 F.2d 210, 212-13 (1st Cir.1990). In that event, however, since the injunction itself is properly before us, we see no difficulty in reviewing the specific requirements--to hire a coach, recruit players, and schedule a fall season--that the district court imposed on defendant.
 
 II
 
 9
 Defendant maintains that, as a matter of law, it did not violate Title IX. Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Since 1988, Title IX has applied to recipients of federal funds in all of their operations. Id. § 1687. The statute delegated to the Secretary of Health, Education and Welfare (now the Secretary of Education)[3] the responsibility to promulgate regulations implementing Title IX, including specifically "intercollegiate athletic activities." Pub.L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). Title 34, § 106.41, of the Code of Federal Regulations applies Title IX to college athletics.
 
 
 10
 * This controversy concerns one subpart of the regulations implementing Title IX. 34 C.F.R. § 106.41(c) provides:
 
 
 11
 A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director [of the Office for Civil Rights] will consider, among other factors:
 
 
 12
 (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes[.]
 
 
 13
 Although § 106.41(c) goes on to list nine other factors that enter into a determination of equal opportunity in athletics,[4] an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes. See Cohen v. Brown Univ., 991 F.2d 888, 897-98 (1st Cir.1993); Favia v. Indiana Univ. of Penn., 812 F.Supp. 578, 584-85 (W.D.Pa.1993); see also 44 Fed.Reg. 71,413, 71,415-17 (1979) (HEW Title IX Intercollegiate Athletics Policy Interpretation, describing the three major areas of regulatory compliance as "Athletic Financial Assistance (Scholarships)," "Equivalence in Other Athletic Benefits and Opportunities," and "Effective Accommodation of Student Interests and Abilities"); Office for Civil Rights, Department of Education, Title IX Athletics Investigator's Manual 7 (1990) [hereinafter Investigator's Manual] ("[a]n investigation may be limited to less than all three of these major areas").
 
 
 14
 In 1979, the Department of Health, Education, and Welfare issued a policy interpretation explaining the ways in which institutions may effectively accommodate the interests and abilities of their student athletes. See Policy Interpretation, 44 Fed.Reg. 71,413 (1979). We defer substantially to an agency's interpretation of its own regulations. Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, ----, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991). This is especially so when, as here, they are effectively legislative, pursuant to a statutory delegation. The Policy Interpretation delineates three general areas in which the OCR will assess compliance with the effective accommodation section of the regulation, as follows:
 
 
 15
 a. The determination of athletic interests and abilities of students;
 
 
 16
 b. The selection of sports offered; and
 
 
 17
 c. The levels of competition available including the opportunity for team competition.
 
 
 18
 44. Fed.Reg. at 71,417. Despite some similar and overlapping language in the Policy Interpretation's discussion of these three broad policy areas, a close reading of the application sections immediately following this initial statement of policy reveals that plaintiffs' claim concerns their opportunity to participate in team competition. The OCR assesses effective accommodation with respect to opportunities for intercollegiate competition by determining:
 
 
 19
 (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
 
 
 20
 (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
 
 
 21
 (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.
 
 
 22
 Id. at 71,418.
 
 
 23
 In effect, "substantial proportionality" between athletic participation and undergraduate enrollment provides a safe harbor for recipients under Title IX. In the absence of such gender balance, the institution must show that it has expanded and is continuing to expand opportunities for athletic participation by the underrepresented gender, or else it must fully and effectively accommodate the interests and abilities among members of the underrepresented gender.
 
 
 24
 In addition to assessing whether individuals of both sexes have the opportunity to compete in intercollegiate athletics, the OCR also examines whether the quality of competition provided to male and female athletes equally reflects their abilities. This will depend on whether, program wide, the competitive schedules of men's and women's teams "afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities," id., or "[w]hether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex." Id. However, "[i]nstitutions are not required to upgrade teams to intercollegiate status or otherwise develop intercollegiate sports absent a reasonable expectation that intercollegiate competition in that sport will be available within the institution's normal competitive regions." Id.
 
 B
 
 25
 The district court found that plaintiffs met their burden of showing that defendant could not take shelter in the safe harbor of substantial proportionality.[5] The district court reviewed a substantial quantity of statistical data, and made the undisputed finding that following the termination of the varsity softball program, the disparity between enrollment and athletic participation for women at CSU is 10.5%. Defendant maintains that, as a matter of law, a 10.5% disparity is substantially proportionate.[6]
 
 
 26
 The OCR has instructed its Title IX compliance investigators that "[t]here is no set ratio that constitutes 'substantially proportionate' or that, when not met, results in a disparity or a violation." Investigator's Manual at 24. However, in the example immediately preceding this statement, the Manual suggests that substantial proportionality entails a fairly close relationship between athletic participation and undergraduate enrollment.[7] Furthermore, in a Title IX compliance review completed in 1983, the OCR found that CSU's athletic participation opportunities for men and women were not substantially proportionate to their respective enrollments. During the three years that were the subject of that review, the differences between women enrolled and women athletes were 7.5%, 12.5%, and 12.7%. The district court relied on these sources, as well as expert testimony that a 10.5% disparity is statistically significant, in concluding that CSU could not meet this first benchmark. See also Cohen v. Brown Univ., 809 F.Supp. 978, 991 (D.R.I.1992) (11.6% disparity not substantially proportionate) aff'd, 991 F.2d 888 (1st Cir.1993). Without demarcating further the line between substantial proportionality and disproportionality, we agree with the district court that a 10.5% disparity between female athletic participation and female undergraduate enrollment is not substantially proportionate. The fact that many or even most other educational institutions have a greater imbalance than CSU does not require a different holding.
 
 C
 
 27
 The district court also found that defendant could not prove a history and continuing practice of expansion in women's athletics at CSU.[8] Defendant argues that the district court should have given greater weight to its dramatic expansion of women's athletic opportunities during the 1970s. In essence, defendant suggests reading the words "continuing practice" out of this prong of the test. In support of this position, defendant offers anecdotal evidence of enforcement at other institutions, and the OCR's 1983 finding of compliance for CSU, which was contingent upon CSU's fulfilling the provisions of a plan that CSU never met.
 
 
 28
 Although CSU created a women's sports program out of nothing in the 1970s, adding eleven sports for women during that decade, the district court found that women's participation opportunities declined steadily during the 1980s. Furthermore, although budget cuts in the last twelve years have affected both men and women athletes at CSU, the district court found that women's participation opportunities declined by 34%, whereas men's opportunities declined by only 20%. The facts as found by the district court (and largely undisputed by defendant) can logically support no other conclusion than that, since adding women's golf in 1977, CSU has not maintained a practice of program expansion in women's athletics, and indeed has since dropped three women's sports. See Appellant's Opening Brief at 7-8 n. 4.
 
 
 29
 We recognize that in times of economic hardship, few schools will be able to satisfy Title IX's effective accommodation requirement by continuing to expand their women's athletics programs. Nonetheless, the ordinary meaning of the word "expansion" may not be twisted to find compliance under this prong when schools have increased the relative percentages of women participating in athletics by making cuts in both men's and women's sports programs. Financially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population.[9]D
 
 
 30
 The district court found that defendant could not demonstrate that CSU's athletic program fully and effectively accommodated the interests and abilities of women athletes. Here we hold that the district court improperly placed the burden of proof on defendant. Because a Title IX violation may not be predicated solely on a disparity between the gender composition of an institution's athletic program and the gender composition of its undergraduate enrollment, see 20 U.S.C. § 1681(b), plaintiff must not only show that the institution fails on the first benchmark of substantial proportionality but also that it does not fully and effectively accommodate the interests and abilities of its women athletes. See Cohen, 991 F.2d at 897. Further, an institution would be hard-pressed to establish the full and effective accommodation of the interests and abilities of its women athletes in the abstract. The ultimate burden must lie with the plaintiffs to show that they have been "excluded from participation in, [or] denied the benefits of" an athletic program "on the basis of sex." 20 U.S.C. § 1681(a). However, if plaintiffs establish that their interests and abilities are not being accommodated by the university's athletic program, the institution may still decline to upgrade or create an intercollegiate team if there is no reasonable expectation of competition for that team within the institution's normal competitive region.[10]
 
 
 31
 The district court's misallocation of the burden of proof is not fatal in this case. Faced with a similar situation, the First Circuit held that it could make the proper legal determination because the record on this point had been fully developed. See Cohen, 991 F.2d at 903. In the case before us the district court made extensive findings concerning the unmet abilities and interests of the plaintiff softball players, and the feasibility of their organizing a competitive season of play. The district court credited the plaintiffs' testimony regarding their commitment to softball, the recognition they have achieved both as a team and as individuals, and the substantial interest in softball among first year CSU students who are participating in a club team. The district court also credited testimony that softball is increasing in popularity among high school students in Colorado. Although CSU's traditional rivals do not field softball teams, there is no dispute that before the CSU softball team was terminated it played a competitive schedule within its athletic conference. Because the record is more than adequate in this regard, we are able to consider the question of effective accommodation, placing the burden of proof on the plaintiffs.
 
 
 32
 The heart of the controversy is the meaning of the phrase "full and effective accommodation of interests and abilities." Defendant maintains that even if there is interest and ability on the part of women athletes at CSU, the university is obliged to accommodate them only to the extent it accommodates men. Thus, the argument goes, plaintiffs cannot be heard to complain because both women's softball and men's baseball were eliminated in the last round of cuts and there are more disappointed male than female athletes at CSU. The First Circuit rejected this position in Cohen, and so do we. "[T]his benchmark sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." Id. at 898.
 
 
 33
 Based on the district court's subsidiary findings of fact, we conclude that plaintiffs met the burden of showing that CSU has not accommodated their interests and abilities fully and effectively. Questions of fact under this third prong will be less vexing when plaintiffs seek the reinstatement of an established team rather than the creation of a new one.[11] Here, plaintiffs were members of a successful varsity softball team that played a competitive schedule as recently as the spring of 1992. Although apparently four plaintiffs have transferred and one has been dismissed, seven or eight plaintiffs remain at CSU for at least part of the 1993-94 school year and would be eligible to play on a reinstated team. We agree with the district court that CSU fails the third prong of effective accommodation test.[12]
 
 E
 
 34
 Finally, defendant argues that the district court erred in holding that plaintiffs were not required to show discriminatory intent. Defendant reasons that because Title IX was modeled on Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to -4a, and because discriminatory intent is required to prove a violation of Title VI, see Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 608 n. 1, 103 S.Ct. 3221, 3235 n. 1, 77 L.Ed.2d 866 (1983) (Powell, J., concurring), proof of a Title IX violation must therefore also require intentional discrimination.
 
 
 35
 Defendants neglect to consider the additional holding of Guardians, that "although Title VI itself requires proof of discriminatory intent, the administrative regulations [under Title VI] incorporating a disparate-impact standard are valid." Id. at 584 n. 2, 103 S.Ct. at 3223 n. 2 (opinion of White, J.). Plaintiffs' complaint alleges violations both of Title IX and of the implementing regulations. If we accept defendant's analogy to Title VI, then Guardians would permit us to find a violation of Title IX's regulations without proof of discriminatory intent. See Haffer v. Temple Univ., 678 F.Supp. 517, 539-40 (E.D.Pa.1987), modified, 1988 WL 3845, 1988 U.S.Dist. LEXIS 761.[13]
 
 
 36
 Further, despite the fact that Title IX was explicitly modeled on Title VI, this court has held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to -17, is "the most appropriate analogue when defining Title IX's substantive standards, including the question of whether 'disparate impact' is sufficient to establish discrimination under Title IX." Mabry v. State Bd. of Community Colleges & Occupational Educ., 813 F.2d 311, 316 n. 6 (10th Cir.), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987).[14] Because it is well settled that Title VII does not require proof of overt discrimination, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); 42 U.S.C. § 2000e-2(k), the district court did not err here in failing to require proof of discriminatory intent.
 
 III
 
 37
 Defendant makes two broad objections to the relief ordered by the district court. First, it maintains that plaintiffs have an adequate remedy at law and therefore injunctive relief is inappropriate. Second, defendant argues that it should have been afforded the opportunity to present a plan to the court that would have brought it into compliance with Title IX, rather than ordered to reinstate the softball program and required to take other specific actions with respect to its management of the team.
 
 
 38
 * Defendant suggests for the first time on appeal that because plaintiffs have settled their damages suit, they have been made whole and injunctive relief is unnecessary. We draw no such conclusion. Plaintiffs' damages action is not before us, and we do not presume to know for what they are being compensated. However, insofar as defendant's continuing violation of Title IX operates to deprive plaintiffs of the opportunity to play softball, we believe monetary relief alone is inadequate. The district court correctly ordered an equitable remedy.
 
 B
 
 39
 Defendant's second argument has more substance. Defendant contends that the district court abused its discretion by prescribing the precise manner in which it must comply with Title IX. Defendant objects to the specificity of the district court's order because it believes the district court has ordered it to maintain a softball team in perpetuity, and because it believes it is entitled to devise a plan for its own compliance. Were this a class action, there might be some power to defendant's argument that an order specifically requiring an institution to maintain a softball team goes further than is necessary to correct a violation of Title IX. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("As with any equity case, the nature of the violation determines the scope of the remedy."); Cohen, 991 F.2d at 906 ("Title IX does not require institutions to fund any particular number or type of athletic opportunities"). In a class action case a more appropriate remedy for violation might be to enjoin CSU's conduct of men's varsity competition until defendant presented a plan that would bring CSU into compliance with Title IX. This is, however, an action for relief to individual plaintiffs, brought in their individual capacities.
 
 
 40
 The district court's order of relief directly responds to the harms plaintiffs have sustained, and the relief they have requested, as individuals. Plaintiffs are former members of a terminated varsity program, seeking reinstatement of their team because of defendant's failure to comply with Title IX. The Supreme Court has recognized that in reaching Title IX's goal of protecting private citizens against discriminatory practices, there are situations in which "it makes little sense to impose on an individual, whose only interest is in obtaining a benefit for herself, ... the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cutoff of federal funding is appropriate." Cannon, 441 U.S. at 705, 99 S.Ct. at 1962. This is such a situation. "The award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with--and in some cases even necessary to--the orderly enforcement of [Title IX]." Id. at 705-06, 99 S.Ct. at 1962. The district court correctly provided plaintiffs with individual relief. Had the district court allowed defendant to devise its own plan for Title IX compliance, it would, in effect have been forcing plaintiffs to become unwilling representatives in a class action suit they chose not to bring.
 
 
 41
 Because this is not a class action, the broad sweep of the remedy exists only in defendant's imagination. The district court's order does not apply to Colorado high schools. It does not reach any other college or university. It does not extend the effective accommodation test to any other department of CSU. It does not even require CSU to institute women's varsity soccer or alpine skiing, as defendant fears.[15] Only the CSU softball players have established that their athletic interests and abilities are not being accommodated effectively under Title IX. Therefore, relief is appropriate only for them. Moreover, because this relief runs to plaintiffs individually, defendant is incorrect in its assumption that CSU must sustain a softball team indefinitely. To the contrary, once all the plaintiffs in this case have transferred or graduated, defendant could return to court and seek to have the injunction dissolved. See United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (recognizing "the power of a court of equity to modify an injunction in adaptation to changed conditions"); Cook v. Colgate Univ., 992 F.2d 17, 20 (2d Cir.1993) (vacating as moot a district court order granting varsity status to a women's ice hockey team because all the plaintiffs would have graduated before the order took effect).
 
 
 42
 Further, because the reinstatement of the softball team is predicated upon defendant's Title IX violation, if that violation were remedied in accordance with either of the other two benchmarks of the effective accommodation test defendant would then no longer be obligated to maintain its softball program. If, for example, defendant chose to cut its athletic programs in such a way as to meet the substantial proportionality benchmark, plaintiffs would have no basis for asserting their right to play softball. The district court acknowledged this in its order: "The underlying mandate of this opinion is that CSU may not continue to operate an intercollegiate athletic program that provides a disproportionate amount of participation opportunities to male athletes where there is no evidence of continuing program expansion or effective accommodation of the interests and abilities of its female students." Roberts, 814 F.Supp. at 1519. If defendant decided to operate CSU's athletic program in compliance with the underlying mandate of the district court's opinion, plaintiffs' entitlement to individual relief would evaporate.
 
 
 43
 Finally, we turn to the specifics of the district court's order. Defendant alleges that aspects of the injunction amount to the district court's "micromanaging" CSU's softball program. In one respect, we agree. Under the broad sweep of Title IX, North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 521, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982), the district court has the power to ensure that the reinstated softball program receives all the incidental benefits of varsity status. Thus, we find ample support for the district court's insistence that defendant promptly hire a softball coach, see 34 C.F.R. § 106.41(c)(5) (equal opportunity in athletics includes the opportunity to receive coaching), prepare a field for the softball team's use, see id. § 106.41(c)(7) (practice and competitive facilities), and provide equipment and uniforms, see id. § 106.41(c)(2) (equipment and supplies). The district court also emphasized that defendant must recruit members for its reinstated team, although it did not require defendant to offer scholarships to new recruits. Clearly the district court was concerned that reinstatement of the softball team was not to be done "in a slipshod manner." Appellant's App. at 97. However, insofar as recruiting is integral to team development, it is a core coaching function. Under the Title IX regulations, defendant would not be permitted to hobble a coach's efforts to improve his or her team. Because the district court clearly did not order defendant to offer scholarships, we interpret its order regarding recruiting as part and parcel of its order to hire a coach. Any suggestion that this coach must recruit "top flight varsity players," id. at 98, is merely precatory.
 
 
 44
 The district court did exceed its authority in demanding that the softball team play a fall 1993 exhibition season. The district court's apparent rationale for ordering a fall season, which had not previously been a regular practice at CSU, was to ensure that CSU would be able to field a "competitive" team the following spring. See id. at 80 ("If you don't have [a] fall of '93 season, I don't see how you're going to have a competitive team in '94"). Nothing in Title IX requires an institution to create a "top flight" varsity team, see id. at 97, nor is it within the district court's power, once it reinstates the softball program with all the incidental benefits of varsity status, "to make sure they have a good season." Id. Because a fall season is not required to effect the appropriate remedy, we hold that the district court overstepped its authority in ordering it. See Milliken v. Bradley, 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977) ("federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation").
 
 
 45
 The decision of the district court is AFFIRMED in part and REVERSED in part. The cause is REMANDED with instructions that the injunction be modified consistent with this opinion.
 
 
 
 [1]
 Although Colorado State University (CSU) is also a named defendant, as we discuss hereafter it is not a party to the appeal. Because we also hold that the Colorado State Board of Agriculture (SBA) is a proper appellant, the entity in financial control of CSU and apparently the only entity capable of being sued under state law, we use the singular "defendant" in this opinion with the understanding that SBA's involvement in this appeal concerns its administration of CSU
 We grant the motion of the Trial Lawyers for Public Justice and the National Association for Girls and Women in Sport to file an amicus brief. We grant that part of plaintiffs' motion to clarify the caption of the appeal to show CSU as a defendant only instead of as an appellant. We deny all other motions before us.
 
 
 [2]
 Title IX contains an implied private cause of action. Cannon v. University of Chicago, 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979)
 
 
 [3]
 After Title IX was passed, the Department of Health, Education, and Welfare was divided into the Department of Health and Human Services and the Department of Education; the latter, acting through the OCR, is now the agency charged with administering Title IX
 
 
 [4]
 These other factors include provision of equipment and supplies, scheduling of game and practice times, travel allowances, assignment of coaches and tutors, and provision of locker room and practice facilities. 34 C.F.R. § 106.41(c)(2)-(10)
 
 
 [5]
 Although the Policy Interpretation does not clearly place the burden of showing a disparity between the gender composition of a school's athletic program and the gender composition of its overall enrollment on the party challenging the school's Title IX compliance, the statute itself provides some guidance. Title IX provides that its prohibition against gender discrimination in federally funded programs shall not
 be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: Provided, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists....
 20 U.S.C. § 1681(b). Because an institution is not required to maintain gender balance, it is fair to conclude that proving an imbalance lies with the plaintiff.
 
 
 [6]
 We reject defendant's argument that the district court's decision implicitly requires CSU to maintain parity between women's athletic participation and women's enrollment. The district court applied all three prongs of the effective accommodation test; CSU's failure to meet substantial proportionality did not preclude it from complying with Title IX in either of the other two approved methods
 
 
 [7]
 "[I]f the enrollment is 52% male and 48% female, then, ideally, about 52% of the participants in the athletics program should be male and 48% female...." Investigator's Manual at 24
 
 
 [8]
 Here the language of the Policy Interpretation clearly places the burden of proof on the institution: "whether the institution can show a history and continuing practice of program expansion." 44 Fed.Reg. 71,418
 
 
 [9]
 See Cohen, 991 F.2d at 898-99 n. 15:
 Title IX does not require that a school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent).
 
 
 [10]
 Defendant improperly relies on a provision of the Policy Interpretation pertaining to the second broad policy area, the selection of sports offered, which provides that effective accommodation requires establishing a team only if "[t]here is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team." 44 Fed.Reg. at 71,418. This language applies only when a university sponsors a team in a noncontact sport for one sex, but not for the other
 The Investigator's Manual addresses and obviates the possibility that one talented softball player could force the creation of an entire team. The Manual instructs investigators assessing accommodation of interests and abilities under the third prong of the effective accommodation test to review "whether the institution failed to accommodate 'expressed interest,' for example, athletes of the underrepresented sex participating in a club sport express interest in intercollegiate ... competition or sufficient numbers of individuals to form a team request that a sport be offered." Investigator's Manual at 25 (emphasis added).
 
 
 [11]
 See Cohen, 991 F.2d at 904:
 Although the full and effective accommodation of athletic interests is likely to be a complicated issue where allegedly underrepresented plaintiffs sue to force a university to create a neoteric team or upgrade the status of a club team, there is unlikely to be any comparably turbid question as to interest and ability where, as here, plaintiffs are seeking merely to forestall the interment of healthy varsity teams.
 (citation omitted).
 
 
 [12]
 The OCR agrees that in situations such as the one presented here, a violation is likely:
 OCR investigative experience indicates that where budget restrictions have led a recipient to eliminate sports previously offered, there is frequently a compliance problem with this program component. The tendency is for institutions to eliminate a sport previously offered to women who are already underrepresented in the institutions' athletic programs. The result has been that women are now more disadvantaged by the elimination of a women's team despite sufficient interest and ability to sustain a viable team. In this situation, the institution may well be in violation of this program component. In effect, the participation rates of men and women are not proportionate to their enrollment rates such that women are underrepresented in the athletics program, and the institution is not meeting expressed interests and abilities of female students. Therefore, the institution is not equally effectively accommodating the athletic interests and abilities of male and female students.
 Investigator's Manual at 27.
 
 
 [13]
 The Supreme Court's recent decision in Franklin v. Gwinnett County Pub. Schs., --- U.S. ----, ---- n. 8, 112 S.Ct. 1028, 1038 n. 8, 117 L.Ed.2d 208 (1992), addressing the intent requirement only with respect to monetary damages for a Title IX violation, is not to the contrary
 
 
 [14]
 We believe, however, that Title IX and its implementing regulations offer enough guidance in setting the burden of proof that application of the Title VII model in that regard is not necessary. See supra part II D and nn. 5 & 8
 
 
 [15]
 If, as the district court suggests in dicta, Roberts v. Colorado State University, 814 F.Supp. 1507, 1517-18 (D.Colo.1993), there are female soccer players and alpine skiers at CSU who are aggrieved by the lack of opportunity for varsity competition in their sports, nothing prevents them from bringing suit against defendant for failing to accommodate them effectively as well. That is not the lawsuit before us