William M. KELLEY, Joseph S. Rossi, Robert E. Sims, et al., Plaintiffs–Appellants,

v.

BOARD OF TRUSTEES, University of Illinois, Morton W. Weir, Ronald E. Guenther, et al., Defendants–Appellees.

No. 93–3205.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1994.

Decided Sept. 1, 1994.

Rehearing En Banc Denied Oct. 5, 1994.

John H. Otto (argued), John Gadau, Zimmerly, Gadau, Selin & Otto, Champaign, IL, for plaintiffs-appellants.

James C. Kearns (argued); Fred K. Heinrich, Heyl, Royster, Voelker & Allen, Urbana, IL, for defendants-appellees.

Ellen J. Vargyas, Deborah L. Brake, National Women's Law Center, Washington, DC, for amicus curiae, National Women's Law Center, Cal. Women's Law Center, National Ass'n for Girls and Women in Sport, National Softball Coaches Ass'n, N.W. Women's Law Center, Now Legal Defense and Educ. Fund, Trial Lawyers for Public Justice, Women's Sports Foundation.

James P. Turner, Asst. Atty. Gen., Jessica Dunsay Silver, Linda F. Thome, Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, DC, for amicus curiae, U.S.

Daniel V. Kinsella, Burditt & Radzius, Chicago, IL, for amicus curiae, College Swimming Coaches Ass'n of America, National Interscholastic Swimming Coaches Ass'n of America, American Swimming Coaches Ass'n, Ill. Swimming Ass'n, National Wrestling Coaches Ass'n, U.S. Swimming.

Before CUMMINGS, FLAUM and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

On May 7, 1993, the University of Illinois announced that it intended to terminate four varsity athletic programs, including the men's swimming program, effective July 1, 1993. On May 25, 1993, the plaintiffs, all members of the University of Illinois' men's swimming team prior to its termination, brought suit against the Board of Trustees of the University, its chancellor, athletic director and associate athletic director ("defendants"), alleging that defendants violated Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs' complaint sought damages, as well as an injunction prohibiting the defendants from terminating the men's swimming program, under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3). In response, defendants filed a motion to dismiss, which the parties agreed to convert to a motion for summary judgment. Plaintiffs moved for a preliminary injunction. After hearing testimony in support of plaintiffs' request for a preliminary injunction and receiving affidavits in support of defendants' motion for summary judgment, the district court granted summary judgment in favor of the defendants and found that the request for a preliminary injunction was therefore moot, 832 F.Supp. 237. Plaintiffs now appeal.

## I.

Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 (1988)) provides that

No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity [other than those specifically described in the Act] receiving Federal financial assistance....

In 1974, Congress requested that the Secretary of the Department of Health, Education and Welfare prepare and publish regulations implementing the provisions of Title IX, "includ[ing,] with respect to intercollegiate athletic activities[,] reasonable provisions considering the nature of particular sports." Pub.L. 93–380, 88 Stat. 484, 612 (1974). Promulgated the following year, the pertinent regulation allows schools to field single-sex teams in certain circumstances [1] but requires that they "provide equal athletic opportunity for ... both sexes." 34 C.F.R. § 106.41(c). Section 106.41(c) sets out the factors to be examined in determining whether a school provides equal athletic opportunity. Chief among these, and of primary concern here, is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." Although § 106.41(c) lists nine other factors,[2] an institution may violate Title IX solely by failing to accommodate effectively the interests and abilities of student athletes of both sexes. See *Roberts v. Colorado State Board of Agriculture,* 998 F.2d 824, 828 (10th Cir.1993), certiorari denied, — U.S. —, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993); *Cohen v. Brown University,* 991 F.2d 888, 897–898 (1st Cir.1993).

In 1979, the Department of Health, Education and Welfare, in an effort to encourage self-policing, issued a policy interpretation providing "guidance on what constitutes compliance with the law." 44 Fed.Reg. 71,413 (1979). According to the policy interpretation, an institution has effectively accommodated the interests of its male and female students if it satisfies any of three benchmarks:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion ..., whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. 71,418 (1979). In essence the policy interpretation establishes a presumption that "effective accommodation" has been achieved if males and females at a school participate in intercollegiate sports in numbers substantially proportionate to the number of students of each sex enrolled at the institution (Benchmark 1). If substantial proportionality has not been achieved, a school must demonstrate either that it has a continuing practice of increasing the athletic opportunities of the underrepresented sex (Benchmark 2) or that its existing programs effectively accommodate the interests of that sex (Benchmark 3).

1. An educational institution may (34 C.F.R. § 106.41(b)):
   [O]perate or sponsor separate teams for members of each sex where selection for such teams is based on competitive skill or the activity involved is a contact sport.... For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

2. In determining whether a school has provided equal opportunities for men and women, factors to be considered include (34 C.F.R. § 106.41(c)):
   (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
   (2) The provision of equipment and supplies;
   (3) Scheduling of games and practice time;
   (4) Travel and per diem allowance;
   (5) Opportunity to receive coaching and academic tutoring;
   (6) Assignment and compensation of coaches and tutors;
   (7) Provision of locker rooms, practice and competitive facilities;
   (8) Provision of medical and training facilities and services;
   (9) Provision of housing and dining facilities and services;
   (10) Publicity.

## II.

In 1982, the Office of Civil Rights of the United States Department of Education [3] determined that the University of Illinois had denied its female students equal athletic opportunities. Relying on the University's representations that it would remedy the disparity within a reasonable period of time, the Office of Civil Rights concluded that the school was not in violation of Title IX. A decade later, however, female participation in intercollegiate athletics at the University of Illinois continued to be disproportionate to female undergraduate enrollment. Thus in 1993, for example, while women comprised 44% of the student body of the University, they accounted for only 23.4% of the school's intercollegiate athletes.

It was against this backdrop that the decision to cut the men's swimming program was made. Faced with a significant deficit in its athletic budget—$600,000 before the receipt of substantial, unanticipated income from a college football bowl game—the University determined that it would need to reduce athletic costs significantly. Determined to field only teams "capable of competing for championships in the Big Ten Conference [the athletic conference to which the University belongs] and the National Collegiate Athletic Association" (Appellees' Br. at 7), the University concluded that it would have to discontinue certain intercollegiate teams in order to eliminate its deficit.

While the University's decision to reduce its athletic offerings was motivated by budget considerations, other considerations—including the need to comply with Title IX—influenced the selection of particular programs to be terminated. The final selection of the teams to be eliminated was made by defendant Morton Weir, then chancellor of the University's Urbana–Champaign Campus. In reaching his decision, Chancellor Weir relied on the recommendation of the Athletic Board of Control, a body that advises the chancellor on athletic issues. The

Athletic Board of Control, in turn, relied on advice from the University's Athletic Director, defendant Ronald Guenther. In making his recommendation, Guenther evaluated all 19 sports offered by the University against seven criteria: (1) whether or not the Big Ten Conference and the National Collegiate Athletic Association sponsored a championship in the sport; (2) the tradition of success of the sport at the University; (3) the level of interest and participation in the sport at the high school level; (4) the adequacy of the University's facilities for the sport; (5) the level of spectator interest in the sport; (6) gender and ethnic issues; and (7) the cost of the sport. Guenther recommended that four teams—men's swimming, men's fencing, and men's and women's diving—be cut, a recommendation adopted by Chancellor Weir.

Men's swimming was selected for termination because, among other things, the program was historically weak, swimming is not a widely offered athletic activity in high schools, and it does not have a large spectator following. The University did not eliminate the women's swimming program because the school's legal counsel advised that such action would put the University at risk of violating Title IX.

## III.

■ The University's decision not to terminate woman's swimming program was—given the requirements of Title IX and the applicable regulation and policy interpretation—extremely prudent. The percentage of women involved in intercollegiate athletics at the University of Illinois is substantially lower than the percentage of women enrolled at the school. If the University had terminated the women's swimming program, it would have been vulnerable to a finding that it was in violation of Title IX. Female participation would have continued to be substantially disproportionate to female enroll-

---

**3.** Although Title IX was initially administered by the Department of Health, Education and Welfare, Congress later created a distinct department for education and assigned to it the Department of Health, Education and Welfare's regulatory powers over education. After its creation

the Department of Education adopted the regulation relevant here and, "as a practical matter" has treated the relevant policy interpretation as its own. *Cohen v. Brown University*, 991 F.2d 888, 896 (1st Cir.1993).

ment, and women with a demonstrated interest in an intercollegiate athletic activity and demonstrated ability to compete at the intercollegiate level would be left without an opportunity to participate in their sport. *Roberts*, 998 F.2d at 828–832. The University could, however, eliminate the men's swimming program without violating Title IX since even after eliminating the program, men's participation in athletics would continue to be more than substantially proportionate to their presence in the University's student body. And as the caselaw makes clear, if the percentage of student-athletes of a particular sex is substantially proportionate to the percentage of students of that sex in the general student population, the athletic interests of that sex are presumed to have been accommodated. *Cohen*, 991 F.2d at 898 (explicating applicable policy interpretation). The University's decision to retain the women's swimming program—even though budget constraints required that the men's program be terminated—was a reasonable response to the requirements of the applicable regulation and policy interpretation.

Plaintiffs contend, however, that the applicable regulation, 34 C.F.R. § 106.41, and policy interpretation, 44 Fed.Reg. 71,418 (1979), pervert Title IX.[4] Title IX, plaintiffs contend, "ha[s] through some alchemy of bureaucratic regulation been transformed from a statute which prohibits discrimination on the basis of sex into a statute that mandates discrimination against males ..." (Br. 9). Or, as plaintiffs put it later: "If a university is required by Title IX to eliminate men from varsity athletic competition ..., then the same Title IX [sh]ould require the university to eliminate women from the academic departments where they are over[-]represented and men from departments where they have been over[-]represented. Such a result would be ridiculous." (Br. 10).

We agree that such a result would be ridiculous. But Congress itself recognized that addressing discrimination in athletics presented a unique set of problems not raised in areas such as employment and academics. See, *e.g., Sex Discrimination Regulations, Hearings Before the Subcommittee on Post Secondary Education of the Committee on Education and Labor*, 94th Cong. 1st Sess. at 46, 54, 125, 129, 152, 177, 299–300 (1975); 118 Cong.Rec. 5,807 (1972) (statement of Sen. Bayh); 117 Cong.Rec. 30,407 (1971) (same). Congress therefore specifically directed the agency in charge of administering Title IX to issue, with respect to "intercollegiate athletic activities," regulations containing "reasonable provisions considering the nature of particular sports." Pub.L. No. 93–380, 88 Stat. 484, 612. And where Congress has specifically delegated to an agency the responsibility to articulate standards governing a particular area, we must accord the ensuing regulation considerable deference. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) (Where Congress has expressly delegated to an agency the power to "elucidate a specific provision of a statute by regulation," the resulting regulations should be given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

The regulation at issue here is neither "arbitrary ... [n]or manifestly contrary to the statute." Cf. *id.* The regulation provides that notwithstanding Title IX's requirement that "[n]o person ... shall, on the basis of sex, be excluded from participation in ... any ... activity," a school may "sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a), (b). Such a provision is not at odds with the purpose of Title IX[5] and we do not under-

---

**4.** Plaintiffs also contend that Title IX prohibited the University, when deciding which athletic programs to terminate, from taking gender into account. Plaintiffs, however, do not contend that the University considered gender any more than it was required to by the applicable regulation and policy interpretation—nor would the record support such a contention if made. Thus the

plaintiffs' claim is, in essence, a claim that the relevant regulation and policy interpretation violate Title IX, an argument addressed *infra* at 70–71.

**5.** Congress would indeed be surprised to learn that Title IX mandated co-ed football teams.

stand plaintiffs to argue that it is. And since 34 C.F.R. § 106.41 is not manifestly contrary to the objectives of Title IX, this Court must accord it deference.

Plaintiffs, while they concede the validity of 34 C.F.R. § 106.41, argue that the substantial proportionality test contained in the agency's policy interpretation of that regulation establishes a gender-based quota system, a scheme they allege is contrary to the mandates of Title IX. But the policy interpretation does not, as plaintiffs suggest, mandate statistical balancing. Rather the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance.[6] Even if substantial proportionality has not been achieved, a school may establish that it is in compliance by demonstrating either that it has a continuing practice of increasing the athletic opportunities of the underrepresented sex or that its existing programs effectively accommodate the interests of that sex.

■ Moreover, once it is agreed Title IX does not require that all teams be co-ed—a point the plaintiffs concede—and that 34 C.F.R. § 106.41 is therefore a valid regulation, schools must be provided some means of establishing that despite offering single-sex teams, they have provided "equal athletic opportunit[ies] ... for both sexes."[7] Undoubtedly the agency responsible for enforcement of the statute could have required schools to sponsor a women's program for every men's program offered and vice versa. Requiring parallel teams would certainly have been the simplest method of ensuring equality of opportunity—and plaintiffs would doubtless have preferred this approach since,

had it been adopted, the men's swimming program would likely have been saved. It was not unreasonable, however, for the agency to reject this course of action. Requiring parallel teams is a rigid approach that denies schools the flexibility to respond to the differing athletic interests of men and women.[8] It was perfectly acceptable, therefore, for the agency to chart a different course and adopt an enforcement scheme that measures compliance by analyzing how a school has allocated its various athletic resources.[9]

■ This Court must defer to an agency's interpretation of its regulations if the interpretation is reasonable, *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991), a standard the policy interpretation at issue here meets. Measuring compliance through an evaluation of a school's allocation of its athletic resources allows schools flexibility in meeting the athletic interests of their students and increases the chance that the actual interests of those students will be met. And if compliance with Title IX is to be measured through this sort of analysis, it is only practical that schools be given some clear way to establish that they have satisfied the requirements of the statute. The substantial proportionality contained in Benchmark 1 merely establishes such a safe harbor. *Roberts*, 998 F.2d at 828.

Since the policy interpretation maps out a reasonable approach to measuring compliance with Title IX, this Court does not have the authority to condemn it. *Martin*, 499 U.S. at 150, 111 S.Ct. at 1175–76. Plaintiffs' claim that the University of Illinois violated Title IX when it terminated the men's swimming program is, therefore, rejected. The

---

6. We express no opinion as to whether, if the policy interpretation did in fact mandate substantial proportionality, it would be unconstitutional or in contravention of the statute.

7. In the three years following the issuance of 34 C.F.R. § 106.41, the Department of Health, Education and Welfare received over one hundred discrimination complaints involving over fifty schools. The policy interpretation here at issue was promulgated in an effort to enable these schools and others to establish whether they

were in compliance with Title IX. *Cohen*, 991 F.2d at 896.

8. Requiring parallel teams would, for example, require the University either to terminate the football program or to begin a women's team, even if female students had little interest in that sport but had great interest in other sports.

9. The three benchmarks established by the agency's policy interpretation all assess compliance in this manner. These benchmarks are set out *supra* at 268.

University's actions were consistent with the statute and the applicable regulation and policy interpretation. And despite plaintiffs' assertions to the contrary, neither the regulation nor the policy interpretation run afoul of the dictates of Title IX.

## IV.

Plaintiffs' final argument is that the defendants' decision to eliminate the men's swimming program while retaining the women's program denied them equal protection of law as guaranteed by the Fourteenth Amendment. We do not agree. First, the record makes clear that the University considered gender solely to ensure that its actions did not violate federal law. And insofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiffs' attack on those actions is merely a collateral attack on the statute and regulations and is therefore impermissible. *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 424 (7th Cir.1991), certiorari denied, 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991).

To the extent that plaintiffs' argument is that Title IX and the applicable regulation—rather than the actions of the defendants—are unconstitutional, it is without merit. While the effect of Title IX and the relevant regulation and policy interpretation is that institutions will sometimes consider gender when decreasing their athletic offerings, this limited consideration of sex does not violate the Constitution. Congress has broad powers under the Due Process Clause of the Fifth Amendment to remedy past discrimination. *Metro Broadcasting, Inc. v. Federal Communications Comm'n*, 497 U.S. 547, 565–566, 110 S.Ct. 2997, 3008–10, 111 L.Ed.2d 445 (1990). Even absent a specific finding that discrimination has occurred, remedial measures mandated by Congress are "constitutionally permissible to the extent that they serve important governmental objectives ... and are substantially related to achievement of those ends." *Id.* at 565, 110 S.Ct. at 3009; see also *Mississippi University for Women v. Hogan*, 458 U.S. 718, 728, 102 S.Ct. 3331, 3338, 73 L.Ed.2d 1090 (1982). There is no doubt but that

removing the legacy of sexual discrimination—including discrimination in the provision of extra-curricular offerings such as athletics—from our nation's educational institutions is an important governmental objective. We do not understand plaintiffs to argue otherwise.

Plaintiffs' complaint appears, instead, to be that the remedial measures required by Title IX and the applicable regulation and policy interpretation are not substantially related to their purported goal. Plaintiffs contend that the applicable rules allow "the University to ... improve[ ] its statistics without adding any opportunities for women ..." (Br. 23), an outcome they suggest is unconstitutional. But to survive constitutional scrutiny, Title IX need not require—as plaintiffs would have us believe—that the opportunities for the underrepresented group be continually expanded. Title IX's stated objective is not to ensure that the athletic opportunities available to women increase. Rather its avowed purpose is to prohibit educational institutions from discriminating on the basis of sex. And the remedial scheme established by Title IX and the applicable regulation and policy interpretation are clearly substantially related to this end. Allowing a school to consider gender when determining which athletic programs to terminate ensures that in instances where overall athletic opportunities decrease, the actual opportunities available to the underrepresented gender do not. And since the remedial scheme here at issue directly protects the interests of the disproportionately burdened gender, it passes constitutional muster. *Mississippi University for Women*, 458 U.S. at 728, 102 S.Ct. at 3338 ("[A] gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened."); see also *Cohen*, 991 F.2d at 900–901 (holding that Title IX and the applicable regulation and policy interpretation do not violate the Equal Protection Clause).

## V.

Since the district court correctly determined that the University of Illinois deci-

sion to terminate the men's swimming program did not violate Title IX or the Equal Protection Clause, its decision is affirmed.