BAY AREA ADDICTION RESEARCH AND TREATMENT, INC.; California Detoxification Programs, Inc.; Ron Kletter, Ph.D.; Vicki Roe; Susan Coe; Rhonda Loe; Ray Doe; Oscar Voe; Cindy Moe; Robin Poe; Mary Foe, Plaintiffs–Appellants,

v.

CITY OF ANTIOCH, Defendant– Appellee.

No. 98–16612.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1999.

Decided June 3, 1999.

726

Amitai Schwartz, Law Offices of Amitai Schwartz, San Francisco, California, for the plaintiffs-appellants.

Gary M. Lepper, Lepper, Schaefer, & Harrington, Walnut Creek, California, for the defendant-appellee.

Before: SNEED, TASHIMA, and SILVERMAN, Circuit Judges.

TASHIMA, Circuit Judge:

In 1998, Bay Area Addiction Research and Treatment, Inc. ("BAART") and California Detoxification Programs, Inc. ("CDP") tried to relocate their methadone clinic to the City of Antioch, California. After BAART and CDP received notice from Antioch that the proposed location could be used for such a clinic under Antioch's zoning plan, the Antioch City Council enacted an urgency ordinance prohibiting

the operation of methadone clinics within 500 feet of residential areas, thereby precluding the use of the proposed site. BAART, individual patients of BAART, CDP, and Dr. Ron Kletter, the executive director of both, (collectively "Bay Area") brought suit against Antioch pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–65, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, among others. The district court denied Bay Area's motion for a preliminary injunction enjoining the urgency ordinance. Bay Area appeals, contending that the district court applied the wrong legal test to its ADA and Rehabilitation Act claims and misjudged the irreparability of the harm it would suffer if an injunction did not issue. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). We hold that Title II of the ADA and § 504 of the Rehabilitation Act apply to zoning ordinances, and that the district court abused its discretion by applying the wrong legal test to Bay Area's ADA and Rehabilitation Act claims. Accordingly, we reverse and remand.

## I.

BAART has operated a clinic for 13 years in a municipal courthouse in Pittsburg, California, that provides outpatient methadone treatment to people who have been addicted to heroin. CDP provides short-term outpatient heroin detoxification services at the same location. Although BAART and CDP are distinct entities, they work closely together at clinic locations throughout California. BAART and CDP plan to share space at the location at issue in this case. We will use the abbreviation "BAART" to refer to both BAART and CDP in this statement of the facts.

On December 2, 1997, Contra Costa County notified BAART that its lease of office space in the Pittsburg courthouse would be terminated on September 30, 1998, because the County needed the premises for other uses.[1] BAART began to look for a site to which it could relocate near Antioch or Pittsburg, as approximately one-half of BAART's patients reside in one city or the other. BAART set forth six criteria for its new location: (1) proximity to Antioch or Pittsburg, (2) accessibility to public transportation, (3) approximately 5,000 square feet in size, (4) compliant with building codes, (5) parking for approximately 20 cars, and (6) availability for purchase or long-term lease with an option to purchase.[2] After searching for several months, BAART found a location in Antioch (the "Sunset Lane site") that satisfies these criteria. While the Sunset Lane site was at one time occupied by a medical practice and shares a street with many medical and commercial offices, it abuts a residential neighborhood.

On April 15, 1998, the deputy director of Antioch's Community Development Department notified BAART in writing that a clinic like BAART's would be a permitted use of the Sunset Lane site under Antioch's land use plan.[3] Subsequently, on April 27, 1998, BAART filed a business license application for the Sunset Lane site. The next day, Dr. Kletter and his wife orally agreed to purchase the site, and on May 18, 1998, they entered into a written purchase agreement.[4]

1. Pending this court's resolution of this appeal, BAART relocated to a modular unit in the back of the courthouse.

2. We express no opinion as to the reasonableness of these criteria.

3. The letter stated in relevant part:
The General Plan land use for the site is Office and the zoning designation is [Planned Development]. Medical uses including clinics are permitted uses under these designations. The proposed occupant of the site, BAART Comprehensive Health Care Services, which is a clinic that provides medical and psychological services for drug and alcohol dependent patients, would therefore be a permitted use.

4. During the pendency of this lawsuit, the purchase agreement has been extended from month to month upon payment of a fee.

By mid-April, 1998, Antioch residents had learned of BAART's plans for the Sunset Lane site and began to express their concern that the methadone clinic would result in an increase in crime and drug abuse near Sunset Lane and throughout Antioch. The issue was addressed at the April 28, 1998, Antioch City Council meeting, at which many residents commented on the proposed use of the Sunset Lane site.[5] Following this hearing, the City Council unanimously approved Ordinance No. 938–C–S, an urgency ordinance, pursuant to section 65858 of the California Government Code, which authorizes a city to prohibit a land use for 45 days in order to study the proposed use. *See* Cal. Gov't Code § 65858 (West 1999). The ordinance forbids the issuance of any permits to or the operation of any new substance abuse clinics, including methadone clinics, located within 500 feet of any residential property.

On June 9, 1998, the city council approved Ordinance No. 941–C–S, another urgency ordinance, that extended the effective date of the original ordinance to April 10, 1999.[6] The second ordinance amended the first ordinance so as to prohibit only methadone clinics from operating within 500 feet of any residential property. The "Legislative Findings and Conclusions" accompanying the second ordinance included both statistics and generalities from which the city council concluded that "[t]he proposed methadone clinic at its proposed location represents a current and immediate threat to the public peace, health, safety and welfare." Specifically, the city council found that the methadone clinic would attract drug dealers and lead to an increase in crime in the area surrounding the clinic.[7] The ordinance provided for further studies of the impact of methadone clinics on nearby residences and children.

Antioch and BAART subsequently tried to find an alternative site for the clinic, but no agreement was reached.

On July 6, 1998, Bay Area brought a class action lawsuit against Antioch under the ADA, the Rehabilitation Act, and 42 U.S.C. § 1983, for violations of the Supremacy, Due Process, and Equal Protection Clauses. Bay Area sought a declara-

---

5. The residents' comments in large part exhibited sympathy for the people serviced by BAART but emphasized safety concerns, particularly for children, arising from the increase in crime that they believed would accompany the clinic, and the need to maintain neighborhood cohesion. For example, one concerned neighbor said, "[o]ur main concern here is the safety of our children and the security of our neighborhood." Another resident stated, "[w]e try to maintain a good image for our community, but the added influx of 200 felons as well as those who would prey on their misfortunes and addictions is more than I or the other residents can survive." A former resident of Pittsburg discussed his experiences living near the Pittsburg clinic:

> People hang around before and after their treatments. There's fighting and threatening of neighbors. Trespassing and property damage is a regular occurrence. Loud and abusive language. You have people begging for money, they come to your door, knock on your door and ask for food and money and whatever. Drug dealings happen all the time.

Dr. Kletter also appeared before the city council. He testified that "by and large [me-

thadone patients'] crime rate is reduced by 80 percent immediately. The longer patients remain in treatment, the better they do." He further stated:

> Within three months of treatment, 50 percent of the toxicology screens that we provide to each patient on a monthly basis are free of elicit opiates. As people progress, after six months, that number drops down to about 25 percent. After two years in treatment, fewer than five percent of the toxicology screens we perform are positive for opiates.

6. This ordinance has subsequently been extended to be effective through April 10, 2000.

7. The findings included, *inter alia*, that "[h]eroin addicts typically have a long history of criminal involvement," and that "[m]any heroin addicts pay for their habits from crime, often thefts from residences or muggings." Therefore, the city council apparently concluded that the clinic would pose a threat of increased criminal activity in the area because many of the patients would continue to abuse illicit drugs.

tory judgment that Ordinance No. 941–C–S was unlawful and a permanent injunction enjoining Antioch from enforcing the ordinance or otherwise interfering with Bay Area's use of the Sunset Lane site as a methadone clinic.

Soon thereafter, Bay Area moved for a preliminary injunction and Antioch filed a motion to dismiss. The district court denied Bay Area and Antioch's motions, holding that zoning is an activity covered by the ADA and the Rehabilitation Act, and that appellants are qualified individuals with disabilities, entitled to protection under both statutes. *See* 42 U.S.C. § 12131 (1999). The district court decided, however, that at this stage in the litigation, Bay Area had neither demonstrated that it would be irreparably harmed if the court refused to issue a preliminary injunction nor that it was likely to prevail on the merits.

Bay Area argues that the district court erred in refusing to issue a preliminary injunction because the district court considered whether there was an alternative location that would constitute a reasonable accommodation of both sides' interests. Under a test that looks solely to whether a law discriminates on the basis of disability, Bay Area contends, it can show that it is likely to prevail on the merits. Bay Area also contends that it will be irreparably harmed if a preliminary injunction does not issue.

## II.

■ We review the district court's denial of a preliminary injunction for an abuse of discretion. *See Roe v. Anderson,* 134 F.3d 1400, 1402 (9th Cir.), *aff'd sub*

*nom. Saenz v. Roe,* — U.S. ——, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). A district court abuses its discretion if it " 'based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.' " *Id.* (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)); *cf. Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (adopting a single-tier formulation of the abuse of discretion standard of review). "A district court by definition abuses its discretion when it makes an error of law." *Id.*

■ The interpretation of a statute is a question of law reviewed de novo. *See Alexander v. Glickman,* 139 F.3d 733, 735 (9th Cir.1998).

## III.

### A. The Applicability of the ADA and the Rehabilitation Act to Zoning

■ The district court held that the ADA and the Rehabilitation Act apply to zoning, a decision the parties do not contest on appeal. Because the issue is one of first impression in this circuit, however, we discuss it here. In so doing, we adopt much of the persuasive reasoning of the Second Circuit in *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2d Cir.1997),[8] and hold that these statutes do apply to zoning.

As with all exercises in statutory interpretation, we begin with the ADA's text. Title II of the ADA addresses the provision of public services. Section 12132 of this title prohibits discrimination on the basis of disability by public entities.[9] Section 12132 provides that "[s]ubject to the

---

**8.** The Second Circuit is the only circuit to have expressly addressed the applicability of the ADA to zoning. In *Pack v. Clayton County,* 47 F.3d 430 (11th Cir.1995) (table), the Eleventh Circuit summarily affirmed such a holding by the district court.

Our interpretation of Title II of the ADA applies equally to § 504 of the Rehabilitation Act. *See Armstrong v. Wilson,* 124 F.3d 1019,

1023 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998) (noting that the language of the two statutes is "similarly expansive" and that "Congress has directed that the ADA and [Rehabilitation Act] be construed consistently.").

**9.** The City of Antioch is a qualifying public entity. *See* 42 U.S.C. § 12131(1)(A) (1999).

provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1999).[10] Section 12132 thus constitutes a general prohibition against discrimination by public entities.

Other local public entities in similar cases have argued, as Antioch did below, that zoning is not a service, program, or activity, and therefore § 12132 does not apply. We reject this argument. The Rehabilitation Act broadly defines "program or activity" to include "all of the operations of" a qualifying local government. 29 U.S.C. § 794(b)(1)(A) (1999). Because Congress has instructed that the ADA is to be interpreted consistently with the Rehabilitation Act, *see Armstrong v. Wilson,* 124 F.3d 1019, 1023 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *cf. Collings v. Longview Fibre Co.,* 63 F.3d 828, 832 n. 3 (9th Cir.1995) (noting that "Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA"), we interpret § 12132 in light of this definition. The Rehabilitation Act and the ADA apply to zoning because zoning "is a normal function of a governmental entity." *Innovative Health,* 117 F.3d at 44; *Armstrong,* 124 F.3d at 1023 (finding § 12132 to "encompass[ ] all facets of state government"); *cf. Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169, 1174 (9th Cir.1999) ("A common understanding of [the phrase 'services, programs, or activities'] shows that it applies only to the 'outputs' of a public agency, not to 'inputs' such as employment.").

Congress' stated purposes in enacting the ADA also support its application to zoning. Within the text of the ADA, Congress set forth its broad goal of "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (1999). Congress found that

> individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7) (1999). This sweeping language—most noticeably Congress's analogizing the plight of the disabled to that of "discrete and insular minorit[ies]" like racial minorities, *see United States v. Carolene Prods. Co.,* 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (defining religious, national, and racial minorities as "discrete and insular minorities"),—strongly suggests that § 12132 should not be construed to allow the creation of spheres in which public entities may discriminate on the basis of an individual's disability.

The ADA's legislative history buttresses our interpretation of § 12132. For example, the report of the House Committee on Education and Labor suggests that at least this committee intended § 12132 to have a broad application.

> The Committee has chosen not to list all the types of actions that are included within the term "discrimination", as was done in titles I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in sec-

---

**10.** Section 504 of the Rehabilitation Act contains a similar prohibition. 29 U.S.C. § 794(a) provides, "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a) (1999).

tion 504 [of the Rehabilitation Act, 29 U.S.C. § 794] to all actions of state and, local governments.

H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367. Perhaps even more significant is the fact that the House bill's general prohibition against discrimination won out over the Senate bill's enumeration of general and specific prohibitions against discrimination. *See* H.R. Conf. Rep. No. 101–596, at 67 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565, 576. In other words, Congress specifically rejected an approach that could have left room for exceptions to § 12132's prohibition on discrimination by public entities.

■ Finally, the Department of Justice's regulations and interpretations of those regulations in its Technical Assistance Manual support our conclusion that zoning is covered by the ADA.[11] For example, the preamble to the regulations implementing § 12132 notes that "title II applies to anything a public entity does." 28 C.F.R. pt. 35, app. A at 438 (1998). Furthermore, the Technical Assistance Manual expressly cites zoning as an example of a public entity's obligation to avoid discrimination:

> Illustration 1: A municipal zoning ordinance requires a set-back of 12 feet from the curb in the central business district. In order to install a ramp to the front entrance of a pharmacy, the owner must

encroach on the set-back by three feet. Granting a variance in the zoning requirement may be a reasonable modification of town policy.

*The Americans with Disabilities Act: Title II Technical Assistance Manual ("TA Manual")* § II–3.6100, illus. 1 (1993).

In sum, "[w]e decline to draw an arbitrary distinction—to prohibit public entities from discriminating against persons with disabilities in some of their activities and not in others...." *Innovative Health,* 117 F.3d at 45. Although we recognize that zoning is a traditionally local activity, Congress has spoken.[12] Accordingly, we hold that the ADA applies to zoning.

### B. The Propriety of Injunctive Relief

■ We hold that the district court abused its discretion by applying an erroneous legal standard to determine whether to grant Bay Area's motion for a preliminary injunction. To obtain a preliminary injunction, Bay Area must demonstrate either "a combination of probable success on the merits and the possibility of irreparable injury" or "that serious questions are raised and the balance of hardships tips in its favor." *Roe,* 134 F.3d at 1402 (internal quotation marks omitted) (citation omitted).[13] We review the district court's decision for an abuse of discretion. *See id.*

**11.** Title II expressly delegates authority to the Attorney General to promulgate regulations implementing § 12132's prohibition against discrimination. *See* 42 U.S.C. § 12134(a) (1999). We must give "[s]uch legislative regulations ... controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute [delegating authority to the agency to promulgate regulations]." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Justice Department's interpretation of its own regulations, such as the Technical Assistance Manual, must also be given substantial deference and will be disregarded only if "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (in-

ternal quotation marks omitted) (citation omitted).

**12.** The Supreme Court has unanimously held that § 12132 covers another traditionally non-federal area—inmates in state prisons. *See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998). Anticipating such a holding, this court in *Armstrong* noted that the fact "[t]hat prison administration may be a core state function does not give us license to disregard clear congressional intent." 124 F.3d at 1025.

**13.** Antioch argues that a heightened standard of proof should apply under which Bay Area would be required to show a substantial likelihood of success because a preliminary injunc-

The district court denied Bay Area's motion for a preliminary injunction because it concluded that Bay Area had neither demonstrated that it was likely to prevail on the merits nor that it would be irreparably harmed if an injunction did not issue. With respect to Bay Area's likelihood of success, the district court found that to prevail on its ADA and Rehabilitation Act claims, Bay Area had to show that it has been " 'excluded from participation in or denied the benefits of some ... activity by reason of [its] disability,' and that the City has failed to provide a reasonable accommodation." (citing § 12132) (omission in original). This analysis, according to the district court, requires a balancing of Bay Area's interest in the operation of the clinic with Antioch's interest in its zoning scheme. Applying this test, the district court concluded that based on the record before it, it was neither persuaded that there were no alternative sites available in Antioch nor that Bay Area's criteria were inflexible. With respect to irreparable harm, the district court concluded that while Bay Area would be harmed if an injunction was not granted, the harm would not be irreparable because there were alternative sites available, though admittedly less advantageous ones than the Sunset Lane site.

Bay Area argues on appeal that the district court incorrectly assessed Bay

Area's likelihood of success on the merits by (1) requiring Bay Area to show that Antioch had failed to provide a reasonable accommodation, because facial discrimination is sufficient to establish a violation of the ADA, and (2) failing to recognize that the ADA prohibits unequal access and segregation, in addition to total exclusion. Bay Area further argues that it will suffer irreparable harm in the absence of a preliminary injunction because there is no viable alternative site for the clinic.

We hold that the district court abused its discretion by applying an erroneous legal standard to determine whether the urgency ordinance is likely to violate the ADA and the Rehabilitation Act. We leave it to the district court on remand to apply the standard set forth below; accordingly, we do not express any view on Bay Area's likelihood of success on the merits.[14]

### 1. The Reasonable Modifications Test

█ The reasonable modification test does not apply in this case because, here, the ordinance in question discriminates on its face. The district court derived its reasonable modifications test from the Justice Department's regulations, case law, the use of the term "reasonable modification" in § 12131(2),[15] and the inherently discriminatory nature of zoning. We conclude that none of these authorities com-

tion would effectively amount to a permanent injunction. We reject this contention for two reasons. First, the relief Bay Area seeks is a prohibitory injunction that merely preserves the status quo. *See Regents of the Univ. of Cal. v. American Broadcasting Cos., Inc.,* 747 F.2d 511, 514 (9th Cir.1984) ("[T]he function of a preliminary injunction is to preserve the status quo *ante litem*," which is defined as " 'the last, uncontested status which preceded the pending controversy.' " (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir.1963))). Second, Antioch may undo the effects of the preliminary injunction if it prevails on the merits by requiring Bay Area to cease using the Sunset Lane site as a methadone clinic. *See Innovative Health Sys., Inc. v. City of White Plains,* 931 F.Supp. 222, 240 (S.D.N.Y.1996), *aff'd,* 117 F.3d 37 (2d Cir.1997).

**14.** Our discussion of the appropriate test for Bay Area's ADA claim applies equally to Bay Area's Rehabilitation Act claim; for the sake of simplicity, we will refer primarily to the ADA.

**15.** Section 12131(2) defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2) (1999). Section 12132's prohibition on discrimination is limited to those who are qualified individuals under § 12131. *See* § 12132 ("[N]o qualified individual with a disability shall ... be subjected to discrimination...." ).

pels the use of a reasonable modifications test in this case.

The district court is correct that the Justice Department's regulations set forth a reasonable modifications test for violations of § 12132 of the ADA. 28 C.F.R. § 35.130(b)(7) provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (1998).

The district court is also correct that we have applied this test in other cases brought pursuant to § 12132. The district court relied predominantly on our decision in *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir.1996), in which visually-impaired individuals who use guide dogs brought suit under § 12132 to challenge Hawaii's policy of quarantining for 120 days all carnivorous animals entering the state. *See id.* at 1481. The policy discouraged individuals traveling to Hawaii from bringing their guide dogs and residents traveling outside of Hawaii from taking their guide dogs with them. *See id.* at 1482. We found the quarantine provision to discriminate against visually-impaired individuals and applied § 35.130(b)(7). *See id.* at 1485. Because there was a dispute as to whether the plaintiffs' proposed solution constituted a "reasonable modification," we remanded the case for further factual findings. *See id.* at 1485–86.

As Bay Area argues, however, § 35.130(b)(7) makes little sense in the context of a statute that discriminates against qualified individuals *on its face* rather than *in its application.* Section 35.130(b)(7) requires reasonable modifications where necessary to avoid discrimination unless such modifications would fundamentally alter the statute in question. The only possible modification of a facially discriminatory law that would avoid discrimination on the basis of disability would be the actual removal of the portion of the law that discriminates on the basis of disability. However, such a modification would fundamentally alter the ordinance. As applied to this case, for example, the urgency ordinance could only be rendered facially neutral by expanding the class of entities that may not operate within 500 feet of a residential neighborhood to include all clinics at which medical services are provided, or by striking the reference to methadone clinics entirely. Either modification would fundamentally alter the zoning ordinance, the former by expanding the covered establishments dramatically, and the latter by rendering the ordinance a nullity. In other words, if § 35.130(b)(7) applies to instances of facial discrimination, cities could easily evade the strictures of the ADA by making statutes expressly discriminatory. Surely this is not what Congress intended when it enacted § 12132 as an absolute prohibition against discrimination.

The case law employing a reasonable modifications test does not provide otherwise. For example, the *Crowder* court expressly found that Hawaii's policy constituted a case of disparate impact discrimination rather than facial discrimination. *See id.* at 1484. Because the *Crowder* court did not discuss whether it would have applied a different test if the policy had been facially discriminatory, *Crowder* cannot stand for the proposition that a reasonable modifications test is required in this case.[16]

16. The district court also relied on the district court decision in *Innovative Health Systems*. Although the district court in the *Innovative Health* case seemed amenable to the application of a reasonable modifications analysis, *see* 931 F.Supp. at 239, the Second Circuit did not mention such a test. Instead, the Second Circuit affirmed the district court's issuance of an injunction because the evidence suggested that the defendants were motivated by inappropriate prejudices. *See* 117 F.3d at 49.

Likewise, § 12131(2), which mentions "reasonable modifications" in its definition of a "qualified individual with a disability," does not require a reasonable modifications test. Although Congress' use of the term "reasonable modifications" suggests that such a test might be proper, it does not follow that this test is required for all suits arising under Title II. Finally, we reject the district court's suggestion that a reasonable modifications test is required because the inherently discriminatory nature of zoning is irreconcilable with the ADA. The breadth of the ADA's purposes and text reveals that localities remain free to distinguish between land uses to effectuate the public interest—they just must refrain from making distinctions based on what Congress has determined to be inappropriate considerations.

■ Therefore, we conclude that § 35.130(b)(7)'s reasonable modifications test does not apply to facially discriminatory laws. Instead, facially discriminatory laws present per se violations of § 12132.

### 2. The Significant Risk Test

■ Contrary to Bay Area's contention, the fact that the urgency ordinance violates § 12132 does not end our inquiry. Section 12131, which defines the class of individuals entitled to § 12132's protection, includes a test that evaluates the risk posed by an individual. Specifically, an individual who poses a significant risk to the health or safety of others that cannot be ameliorated by means of a reasonable modification is not a qualified individual under § 12131.

The Supreme Court developed the significant risk test in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), a case

involving a teacher who had been discharged because she had an active case of tuberculosis. *See id.* at 276, 107 S.Ct. 1123. She brought suit under § 504 of the Rehabilitation Act on the basis that she was dismissed on account of her disability. The Court held that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Id.* at 287 n. 16, 107 S.Ct. 1123. That is, the Court read the significant risk test into the Rehabilitation Act's definition of who constituted a disabled person for purposes of receiving § 504's protection. The Court noted that this test in most cases would require an individualized assessment of the facts if " § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns … as avoiding exposing others to significant health and safety risks." *Id.* at 287, 107 S.Ct. 1123.[17]

We applied the significant risk test to another Rehabilitation Act suit brought by a teacher transferred out of the classroom to an administrative position because he had AIDS. *See Chalk v. United States Dist. Court*, 840 F.2d 701, 707–08 (9th Cir.1988). This court ordered the entry of a preliminary injunction in Chalk's favor because there was no evidence that he posed a significant risk to his students or others. "To allow the court to base its decision on the fear and apprehension of others would frustrate the goals of section 504." *Id.* at 711.

The district court should have used the significant risk test to analyze the alleged

---

**17.** For purposes of an individual with a contagious disease,

> this inquiry should include "[findings of facts], based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious),

> (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." *Arline*, 480 U.S. at 288, 107 S.Ct. 1123 (quoting Amicus Brief for the American Medical Association at 19).

threat posed by appellants, as part of its determination of whether appellants are qualified individuals under § 12131. Using this test in this context comports with both the Justice Department's Technical Assistance Manual and the ADA's purposes.

The Technical Assistance Manual provides for a significant risk test: "An individual who poses a direct threat to the health or safety of others will not be 'qualified' [as an individual protected by title II]." TA Manual § II–2.8000. The Manual defines a direct threat as the *Arline* and *Chalk* courts did:

A "direct threat" is a significant risk to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures, or by the provision of auxiliary aids or services. The public entity's determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability.

TA Manual § II–2.8000.

■ Furthermore, the significant risk test reflects Congress' goals for the ADA and the Rehabilitation Act. On the one hand, this test ensures that decisions are not made on the basis of "the prejudiced attitudes or the ignorance of others." *Arline*, 480 U.S. at 284, 107 S.Ct. 1123. This is particularly important because, as with individuals with contagious diseases, "[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension," *id.*, as the challenges facing recovering drug addicts. On the other hand, the significant risk test recognizes that the ADA does not wholly preclude public entities from making certain distinctions on the basis of disability if those distinctions are absolutely necessary. The significant risk test provides public entities with the ability to craft programs or statutes that respond to serious threats to the public health and safety while insuring that these

(rare) distinctions are based on sound policy grounds instead of on fear and prejudice.

■ Antioch correctly points out that the significant risk test has its own reasonable modifications component. However, the significant risk test will not necessarily result in the same outcome as the district court's test. Under the significant risk test, the court must decide whether the individual poses a significant risk *before* it may proceed to ask whether a reasonable modification may eliminate the risk. *See Arline*, 480 U.S. at 288, 107 S.Ct. 1123; *Chalk*, 840 F.2d at 708 n. 11 ("As no significant risk is posed here, this is not a case involving the standards or limits of accommodation and we do not reach those issues."). The court must first determine whether an individual poses a significant risk. If he does, the court must then ask whether there is a reasonable modification that would counteract the risk. If there is, the individual is qualified for purposes of § 12131. If the individual does not pose a significant risk, the court need never reach the question of whether there is a reasonable modification. Therefore, the district court's test prematurely reaches the reasonable modifications part of the analysis because the district court had not found that Bay Area was likely to pose a significant threat to the health or safety of the residents protected by the zoning ordinance.

■ The next question is how to define a significant risk to health or safety. We find that the determination of whether a significant risk exists requires an individualized assessment of "[t]he nature, duration, and severity of the risk," and "[t]he probability that the potential injury will actually occur." TA Manual § II–2.8000. We do not purport to explore fully the contours of this test for all contexts. For purposes of this case, it is enough to note that "health and safety" includes severe and likely harms to the community that are directly associated with the operation

of the methadone clinic. If supported by the evidence, such harms may include a reasonable likelihood of a significant increase in crime.

Without speculating on the kind and quality of evidence needed to establish a significant risk, we note that in assessing the evidence, courts must be mindful of the ADA's express goal of eliminating discrimination against people with disabilities. *See* 42 U.S.C. § 12101(b)(1). As the *Arline* Court recognized, the Rehabilitation Act was meant to protect disabled individuals "from deprivations based on prejudice, stereotypes, or unfounded fear." 480 U.S. at 287, 107 S.Ct. 1123; *cf. Innovative Health*, 117 F.3d at 49 ("Although [a city] may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from ... stereotypes and generalized fears."). Therefore, it is not enough that individuals pose a hypothetical or presumed risk. Instead, the evidence must establish that an individual does, in fact, pose a significant risk. Further, it should be emphasized that the risk must be of a serious nature.

In sum, because the Antioch ordinance facially discriminates on the basis of the appellants' disability in violation of § 12132, to establish a likelihood of success (or raise serious questions) on the merits, Bay Area need only show that the appellants are qualified under § 12131 to receive protection under § 12132. To do so, Bay Area must demonstrate that it is likely that appellants do not pose a significant risk to the health or safety of the community. If Bay Area cannot make such a showing, it must demonstrate that the risk it poses may be ameliorated by reasonable modifications.

### 3. The Possibility of Irreparable Injury

The district court concluded that Bay Area had not demonstrated that it would be irreparably harmed in the absence of an injunction because there appeared to be other sites available. On appeal, Bay Area offers numerous arguments as to why the district court erred in finding that the harm did not rise to the level of irreparability. For example, Bay Area argues that the methadone patients face discontinuation of their treatment with the attendant threats of relapse, stigma, and emotional distress, and that there are no comparable, adequate sites available. We decline to reach these arguments because the district court may decide this issue differently upon remand, particularly in light of the fact that the availability of alternative locations or other facts may have changed since the district court first addressed Bay Area's motion for injunctive relief.

### IV.

In sum, we hold that Title II of the ADA and § 504 of the Rehabilitation Act apply to zoning ordinances, and that the district court abused its discretion by applying the wrong legal test to Bay Area's ADA and Rehabilitation Act claims. Accordingly, we reverse the district court's order denying Bay Area's motion for a preliminary injunction and remand with instructions that the district court reconsider Bay Area's motion in light of the test set forth herein.

REVERSED and REMANDED.