Stephen NEAL; Jonathan Archuleta; Brent Cameron; Matt Corona; Moses Delfin; Lionel Halsey; Brad Hull; Mike Mendoza; Kirk Metz; Jason Riley; Andy Varner; Larry Vasquez; Nathan Vasquez; Erin Kelly; Natalie Morrow; Friends of Bakersfield Wrestling; Kern County Wrestling Association; National Wrestling Coaches Association; David Afoa; Nick Bradley; Elizar Ceballos; Raphael Davis; Ruben Deleon; Don Delfin; Josh Factor; Jeff Gardner; Max Harris; Thomas Juarez; Brett Lobel; Kevin Means; Jason Merrell; Ian Nelms; Robbie Odell; Tito Ortiz; Josh Ready; Max Schurkamp; Joe Younan; Seba Clemente, Plaintiffs–Appellees,

and

Jeremy Bridges; Dan Corpstein; Tony De Souza; Demetrio Duran; David Molano; Jason Ramstetter; Eric Rowe; Ryan Sheets; Coby Wright; Jessica Arevalo; Cindy Jorgensen; Jessica Ramsey; Abby Schwarzberg; Lori Stocker; Diana Wesendunk, Plaintiffs,

v.

The BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITIES; California State University, Bakersfield; Barry Munitz; Tomas Arciniega; Rudy Carvajal, Defendants–Appellants.

No. 99–15316.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1999

Filed Dec. 15, 1999

Peter W. Davis, Crosby, Heafey, Roach & May, San Francisco, California, for the defendants-appellants.

Mark Martel, Palo Alto, California, for the plaintiffs-appellees.

Josephine R. Potuto, University of Nebraska College of Law, Lincoln, Nebraska, for the amici.

Before: CANBY, HALL, and GRABER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

The instant case requires us to consider whether Title IX prevents a university in which male students occupy a disproportionately high percentage of athletic roster spots from making gender-conscious decisions to reduce the proportion of roster spots assigned to men. We hold that Title IX does not bar such remedial actions.

The Board of Trustees of the California State Universities and other defendants appeal from the district court's order granting the motion of Neal and other plaintiffs for a preliminary injunction. Neal's suit alleged that the decision of California State University, Bakersfield ("CSUB") to reduce the number of spots on its men's wrestling team, undertaken as part of a university-wide program to achieve "substantial proportionality" between each gender's participation in varsity sports and its composition in the campus's student body, violated Title IX and the Equal Protection Clause of the United States Constitution. The district court determined that regulations promulgated pursuant to Title IX, and CSUB's program, which was modeled after those regulations, violated Title IX. The district court declined to reach the merits of the constitutional challenge, but did hold that the regulations interpreting Title IX "raised serious constitutional questions" and rejected Plaintiffs' construction of Title IX on that alternative ground. This Court has jurisdiction to review the district court's granting of a preliminary injunction under 28 U.S.C. § 1292(a)(1). We reverse, and vacate the injunction.

I.

Defendant/Appellant CSUB is a large public university where female students outnumbered male students by roughly 64% to 36% in 1996. The composition of CSUB's varsity athletic rosters, however, was quite different. In the 1992–93 aca-demic year, male students took 61% of the university's spots on athletic rosters and received 68% of CSUB's available athletic scholarship money.

This imbalance helped prompt a lawsuit by the California chapter of the National Organization for Women, alleging that the California State University system was violating a state law that is similar to the federal government's Title IX. That lawsuit eventually settled, resulting in a consent decree mandating, inter alia, that each Cal State campus have a proportion of female athletes that was within five percentage points of the proportion of female undergraduate students at that school. This portion of the consent decree was patterned after the first part of the three-part Title IX compliance test promulgated by the Department of Education's Office for Civil Rights ("OCR").

When the university agreed to the consent decree, California was slowly emerging from a recession, and state funding for higher education was declining. As a result, CSUB administrators were seriously constrained in what they could spend on athletic programs. The university chose to adopt squad size targets, which would encourage the expansion of the women's teams while limiting the size of the men's teams. In order to comply with the consent decree, CSUB opted for smaller men's teams across the board, rejecting the alternative of eliminating some men's teams entirely. CSUB's plan was designed to bring it into compliance with the consent decree by the 1997–98 academic year, meaning that female students would fill at least 55% of the spaces on the school's athletic teams.[1]

As part of this across-the-board reduction in the number of slots available to men's athletic teams, the size of the men's wrestling team was capped at 27. Although the reduction was protested vigorously by wrestling coach Terry Kerr, and team captain Stephen Neal expressed con-

---

1. This figure assumed 60% female enrollment for that year.

cerns that a smaller squad would prove less competitive, the smaller CSUB team performed exceptionally well, winning the Pac–10 Conference title and finishing third in the nation in 1996. In 1996–97, the men's wrestling roster was capped at 25, and four of these spots went unused. Nevertheless, in response to the rumored elimination of the men's wrestling team, on January 10, 1997, the team filed the instant lawsuit, alleging that the university's policy capping the size of the men's team constituted discrimination on the basis of gender in violation of Title IX and the Equal Protection Clause of the Federal Constitution.

The team sought declaratory and injunctive relief to prevent the squad size reductions. CSUB responded by filing a motion to dismiss. The district court initially granted a temporary restraining order preventing the reductions, then granted a preliminary injunction to prevent CSUB from reducing the size of the wrestling team. The district court concluded as a matter of fact that CSUB's primary motivation for capping the size of the men's teams was to meet the gender proportionality requirements in the consent decree. The district court concluded as a matter of law that capping the male teams in order to comply with the consent decree violated Title IX. Although the district court refused to rule on Plaintiffs' equal protection challenge to the CSUB policy, the court did reject a reading of Title IX that created a "safe harbor" for any school that achieved substantial proportionality between the percentage of athletes of one gender and the percentage of students of that same gender. The court concluded that such an approach would raise serious questions under the Equal Protection Clause, and that a desire to avoid reaching such questions, in and of itself, constituted "ample reason for rejecting the safe harbor idea as part of Title IX."

## II.

On appeal, this Court reviews the district court's grant of a preliminary in-

junction for abuse of discretion, and "that discretion is abused where the district court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir.1998) (citation and internal quotation marks omitted), *aff'd sub nom. Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). The district court's interpretation of Title IX is reviewed de novo. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir.1999).

## III.

This case has its origins in Congress's passage of Title IX in 1972. Title IX was Congress's response to significant concerns about discrimination against women in education. *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523–524 & n. 13, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). In the words of the legislation's primary sponsor, Senator Birch Bayh, Title IX was enacted to "provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work." 118 Cong. Rec. 5808 (1972); *see also Bell*, 456 U.S. at 526–27, 102 S.Ct. 1912 ("Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction.... And, because §§ 901 and 902 originated as a floor amendment ... Senator Bayh's statements—which were made on the same day the amendment was passed ... are the only authoritative indications of congressional intent regarding the scope of §§ 901 and 902.").

The regulations promulgated pursuant to Title IX require schools receiving federal funding to "provide equal athletic opportunity for members of both sexes". 34

C.F.R. § 106.41(c). In evaluating schools' compliance with that provision, one factor that will be considered is "whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes". *Id.* at § 106.41(c)(1). At the same time, "it would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in ... colleges." *Williams v. School Dist. of Bethlehem,* 998 F.2d 168, 175 (3d Cir.1993). The drafters of these regulations recognized a situation that Congress well understood: Male athletes had been given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field.

■ Appellees recognize that, given this backdrop, it would be imprudent to argue that Title IX prohibits the use of all gender-conscious remedies. Appellees therefore suggest that gender-conscious remedies are appropriate only when necessary to ensure that schools provide opportunities to males and females in proportion to their relative levels of interest in sports participation. By contrast, Appellants contend that schools may make gender-conscious decisions about sports-funding levels to correct for an imbalance between the composition of the undergraduate student body and the composition of the undergraduate student athletic participants pool. This disagreement has real significance: Men's expressed interest in participating in varsity sports is apparently higher than women's at the present time—although the "interest gap" continues to narrow—so permitting gender-conscious remedies until the proportions of students and athletes are roughly proportional gives universities more remedial freedom than

permitting remedies only until expressed interest and varsity roster spots correspond.

Appellees' argument that equal opportunity is achieved when each gender's athletic participation roughly matches its interest in participating is hardly novel. Several courts of appeals have considered and rejected Appellees' approach as fundamentally inconsistent with the purpose of Title IX.

*Cohen v. Brown University,* 991 F.2d 888 (1st Cir.1993) *("Cohen I"),*[2] was the first case to rule on the issues raised in the instant appeal. In *Cohen I,* female members of Brown's volleyball and gymnastics teams brought suit under Title IX after the university eliminated their teams. Women comprised 48% of the school's student body, but less than 37% of the athletes on campus. *See id.* at 892.

The *Cohen I* court interpreted Title IX's requirements in light of the three-part test set forth in the Policy Interpretation promulgated by the Department of Health, Education, and Welfare in 1979.[3] That test is used to assess whether a school's athletic program is in compliance with Title IX. A university's athletics program is Title IX-compliant if it satisfies *one* of the following conditions:

(1) ... [I]ntercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, ... the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

---

**2.** The First Circuit numbers the *Cohen* decisions differently. Because we discuss only two opinions, we refer to them as *Cohen I* and *Cohen II.*

**3.** The OCR later was authorized by Congress to issue Title IX's regulations with respect to athletic opportunities. *See* Pub.L. No. 93–380, 88 Stat. 612 (1974).

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, ... it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. 71,418 (1979). Appellees attack only the first part of this test, which declares a university Title IX-compliant if participation levels for each gender are "substantially proportionate" to their representation in the student body.

The *Cohen I* court explicitly rejected Brown's argument that, because male athletes were more interested in athletics, the school could bring itself into Title IX compliance by providing females with fewer athletic roster spots "as long as the school's response is in direct proportion to the comparative levels of interest." *Cohen I*, 991 F.2d at 899. In *Cohen II*, the rejection of Brown's argument was even more emphatic: "Brown's relative interests approach cannot withstand scrutiny on either legal or policy grounds, because it disadvantages women and undermines the remedial purposes of Title IX by limiting required program expansion for the underrepresented sex to the status quo level of relative interests." *Cohen v. Brown Univ.*, 101 F.3d 155, 174 (1st Cir. 1996) ("*Cohen II* ") (citations and internal quotations marks omitted).

Under *Cohen I*, if a university wanted to comply with the first part of the three-part test, it had to provide "athletics opportunities in proportion to the gender composition of the student body," not in proportion to the expressed interests of men and women. *Id.* 101 F.3d at 176; *see also Favia v. Indiana Univ. of Penn.*, 7 F.3d 332, 343 (3d Cir.1993) (observing that a university whose student body was 56% female, but whose athletic teams were 43% female, would "appear not to be in Title IX compliance"). The reason for *Cohen I*'s rejection of Brown's/Appellees' "interest" test was clear enough: "Given that the survey of interests and abilities would begin under circumstances where men's athletic teams have a considerable head start, such a rule would almost certainly blunt the exhortation that schools should 'take into account the nationally increasing levels of women's interests and abilities' and avoid 'disadvantag[ing] members of an underrepresented sex....' " 991 F.2d at 900 (quoting 44 Fed.Reg. at 71,417). In other words, Appellees' interpretation of Title IX would have allowed universities to do little or nothing to equalize men's and women's opportunities if they could point to data showing that women were less interested in sports. But a central aspect of Title IX's purpose was to *encourage* women to participate in sports: The increased number of roster spots and scholarships reserved for women would gradually increase demand among women for those roster spots and scholarships.[4] As the First Circuit held in *Cohen II*, "[t]o assert that Title IX permits institutions to provide fewer athletics participation opportunities for women than for men, based upon the premise that women are less interested in sports than are men, is (among other things) to ignore the fact that Title IX was enacted in order to remedy discrimination that results from stereotyped notions of

---

4. That is, the creation of additional athletic spots for women would prompt universities to recruit more female athletes, in the long run shifting women's demand curve for sports participation. As more women participated, social norms discouraging women's participation in sports presumably would be further eroded, prompting additional increases in women's participation levels. *Cf.* Note, *Cheering on Women and Girls in Sports: Using Title IX to Fight Gender Role Oppression*, 110 Harv. L.Rev. 1627, 1640 (1997) ("In effect, the 'substantially proportionate' approach recognizes that women's attitudes toward sports are socially constructed and have been limited by discrimination and gender stereotypes. Congress passed Title IX to combat such discrimination and stereotypes, thereby changing the social environment in which girls and women develop, or do not develop, interests in sports.").

women's interests and abilities." *Cohen II,* 101 F.3d at 178–79; *cf. Horner v. Kentucky High Sch. Athletic Ass'n,* 43 F.3d 265, 272 (6th Cir.1994) ("Moreover, while reliance on the interest of the member schools in adding a sanctioned sport may appear to be gender-neutral, it is a method which has great potential for perpetuating gender-based discrimination. Under the district court's reasoning, a school system's compliance with Title IX can be measured by the personal views of administrators of individual schools, irrespective of whether these views achieve Title IX's equal opportunity requirement.").

Appellees and the district court relied heavily on a lone district court opinion, *Pederson v. Louisiana State Univ.,* 912 F.Supp. 892 (M.D.La.1996), which criticized the Policy Interpretation test's first part. However, this criticism is entirely dicta: The court still found Louisiana State University ("LSU") to be in violation of Title IX and ordered it to bring itself into Title IX compliance immediately, hinting that it should do so by funding women's soccer and softball teams. *See id.* at 922. The court never addressed the issue of whether LSU could bring itself into Title IX compliance by cutting the opportunities available to male athletes because the parties there never suggested such an approach. Moreover, the *Pederson* court misunderstood the reasoning behind *Cohen, Roberts,* and *Horner.* The *Pederson* court held that these circuit court opinions relied upon an erroneous assumption that men and women were equally interested in playing sports. *See id.* 912 F.Supp. at 913–14. As is explained above, those courts emphasized that women's interest in sports appeared to be lower than men's,

but that the genders' interests were slowly but surely converging, which was precisely the reason why requiring only that each gender's expressed interest in participating be accommodated equally would freeze the inequality of the status quo.

Title IX is a dynamic statute, not a static one. It envisions continuing progress toward the goal of equal opportunity for all athletes and recognizes that, where society has conditioned women to expect less than their fair share of the athletic opportunities, women's interest in participating in sports will not rise to a par with men's overnight. The percentage of college athletes who are women rose from 15% in 1972 to 37% in 1998, and Title IX is at least partially responsible for this trend of increased participation by women. *See* Trudy Saunders Bredthauer, *Twenty–Five Years Under Title IX: Have We Made Progress?,* 31 Creighton L.Rev. 1107, 1107 (1998). Title IX has altered women's preferences, making them more interested in sports, and more likely to become student athletes. *See* Note, *Cheering on Women and Girls in Sports: Using Title IX to Fight Gender Role Oppression,* 110 Harv. L.Rev. 1627, 1640–41 (1997). Adopting Appellees' interest-based test for Title IX compliance would hinder, and quite possibly reverse, the steady increases in women's participation and interest in sports that have followed Title IX's enactment.[5]

■ A number of courts of appeals have addressed another potentially dispositive issue in this appeal—namely, whether Title IX permits a university to diminish athletic opportunities available to men so as to bring them into line with the lower athletic opportunities available to women. Every

5. We also view as instructive this Court's precedent in *Jeldness v. Pearce,* 30 F.3d 1220 (9th Cir.1994). That case involved a Title IX suit brought by female prisoners that challenged the lack of vocational educational programs in women's facilities relative to those available in men's facilities. Although the regulations at issue in *Jeldness* are different from those at issue here, the prison context is

somewhat analogous because, as with college athletic teams, "sex segregation is the accepted norm" in prisons. *Id.* at 1228. In *Jeldness,* we rejected the view that differing interest levels among the genders would justify providing women with significantly fewer educational opportunities than men. *See id.* at 1229.

court, in construing the Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) *or* by decreasing athletic opportunities for the overrepresented gender (men in this case). *See Horner,* 43 F.3d at 275; *Kelley v. Board of Trustees,* 35 F.3d 265, 269 (7th Cir.1994); *Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824, 830 (10th Cir.1993) ("We recognize that in times of economic hardship, few schools will be able to satisfy Title IX's effective accommodation requirement by continuing to expand their women's athletics programs.... Financially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population."); *Cohen I,* 991 F.2d at 898 n. 15 ("Title IX does not require that a school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent)."). An extensive survey of Title IX's legislative history and the regulations promulgated to apply its provisions to college athletics concluded that boosters of male sports argued vociferously before Congress that the proposed regulations would require schools to shift resources from men's programs to women's programs, but that Congress nevertheless sided "with women's advocates" by deciding not to repeal the HEW's athletics-related Title IX regulations. Mary Jo Festle, *Playing Nice: Politics and Apologies in Women's Sports* 171–76

(1996). Congress thus appears to have believed that Title IX would result in funding reductions to male athletic programs. If a university wishes to comply with Title IX by leveling down programs instead of ratcheting them up, as Appellant has done here, Title IX is not offended.

■ There is a second reason why a reversal of the district court's order granting injunctive relief on the Title IX claim is warranted. The district court failed to defer properly to the interpretation of Title IX put forward by the administrative agency that is explicitly authorized to enforce its provisions. It is well-established that the federal courts are to defer substantially to an agency's interpretation of its own regulations. *See Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). The Department of Education, "acting through its OCR [is] the administrative agency charged with administering Title IX." *Cohen I,* 991 F.2d at 895. In this instance, Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX. *See* Pub.L. No. 93–380, § 844, 88 Stat. 612 (1974); *Kelley,* 35 F.3d at 269 n. 3; *Roberts,* 998 F.2d at 828; *Cohen I,* 991 F.2d at 895. Under *Chevron,* where Congress has expressly delegated to an agency the power to "elucidate a specific provision of the statute by regulation," that agency's regulations should be accorded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron USA v. NRDC,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ Appellees deem *Chevron* inapplicable on the ground that OCR's interpretation violates the plain meaning of the statute.[6] Under their interpretation, Title IX bars universities from disadvantaging any

---

6. 20 U.S.C. § 1681(a) reads:
   No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected

to discrimination under any education program or activity receiving Federal financial assistance....

student athlete on the basis of his or her gender. But the plain meaning of the nondiscrimination principle set forth in 20 U.S.C. § 1681(a) does not bar remedial actions designed to achieve substantial proportionality between athletic rosters and student bodies. Indeed, Appellees' interpretation of 20 U.S.C. § 1681(a)'s plain meaning would render 1681(b) superfluous. After all, § 1681(b) states that Title IX does not *require*

> any education institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community.... [7]

If § 1681(a) already bars the type of remedial action that Appellant engaged in pursuant to the consent decree, then § 1681(b)'s provision that Title IX does not require such remedial action would be mere surplusage. "Statutes must be interpreted, if possible, to give each word some operative effect." *Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997).

Moreover, we deem it highly instructive that, at oral argument, Appellees conceded that their proposed interpretation of Title IX, whereby a university could permissibly discriminate on the basis of sex in order to ensure that each gender's interests in athletic participation were equally accommodated, is just as contrary to 1681(a)'s purported plain meaning as the interpretation advanced by the OCR and Appellants is.

We also note that Appellees' interpretation of Title IX's text has been rejected explicitly by the Seventh Circuit, *see Kelley*, 35 F.3d at 270, as well as the OCR, and implicitly rejected by the other circuits that have held that a school may cut the number of male athletic slots in order to bring itself into compliance with Title IX. *See Horner*, 43 F.3d at 275; *Roberts*, 998 F.2d at 830; *Cohen I*, 991 F.2d at 898 n. 15. Under such circumstances, it is clear that OCR's interpretation of Title IX's athletics provisions merits deference under *Martin* and *Chevron*. In *Cohen II* and *Kelley* the courts held that 34 C.F.R. § 106.41 deserved controlling weight under *Chevron* and that the OCR Policy Interpretation deserved substantial deference under *Martin*. *See Cohen II*, 101 F.3d at 173; *Kelley*, 35 F.3d at 270–71; *see also Favia v. Indiana Univ. of Penn.*, 812 F.Supp. 578, 584 (W.D.Pa.) (holding that "OCR's policy interpretation deserves our great deference" under *Chevron*), *aff'd* 7 F.3d 332 (3d Cir.1993). Similarly, in the case before us, the 1996 OCR Clarification and the Cantu letter explaining it merit deference under *Martin*. These clarifications essentially adopted the reasoning of *Cohen I* as OCR policy. Under these clarifications' clear wording, an institution in which male athletes are overrepresented can bring itself into Title IX compliance by reducing sufficiently the number of roster spots available to men.

Finally, the district court below rejected the interpretation of Title IX advocated by the OCR and Appellants on the ground that such a reading of the statute might violate the Constitution. In the court's words, OCR's interpretation would

> effectively transform Title IX from an anti-discrimination statute to a statute enacted to remedy past discrimination, thus subjecting it to heightened scrutiny. Without speculating whether Title IX would survive such searching constitutional scrutiny, the court notes that it remains unsatisfied with the *Cohen* majority's treatment of these important questions. The court is satisfied that avoiding serious constitutional questions

---

7. Because the OCR's three-part test gives universities two avenues other than substantial proportionality for bringing themselves into Title IX compliance, it does not conflict with § 1681(b).

such as an equal protection challenge to a very important Congressional statute is itself ample reason for rejecting the safe harbor idea as part of Title IX. The district court thus strained to interpret Title IX in a way that ostensibly would avoid these concerns. In doing so, it followed the interpretive methodology laid out by the Supreme Court in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Chief Justice Burger, writing for the *Catholic Bishop* majority, announced that the Court would decline to construe an act of Congress "in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religious Clauses." *Id.* at 507, 99 S.Ct. 1313; *see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); William N. Eskridge, Jr. & Philip P. Frickey, *Legislation: Statutes and the Creation of Public Policy* 675–87 (2d ed.1995) (discussing *Catholic Bishop* and the canon of construing statutes so as to avoid constitutional problems). Under *Catholic Bishop*, the inquiry properly raised on appeal is not whether the OCR's interpretation of Title IX is unconstitutional, but whether it "raises serious constitutional questions." We answer that question in the negative.

The First and Seventh Circuits both have considered at length the constitutionality of the first prong of the OCR's test. In *Cohen I*, 991 F.2d at 899–901; *Cohen II*, 101 F.3d at 181–84; and *Kelley*, 35 F.3d

at 272–73, the courts emphatically rejected the claim that the Policy Interpretation was unconstitutional under the Fourteenth Amendment. The separate reasoning in the two *Cohen* opinions is particularly well-developed. It applied intermediate scrutiny, which we would also do were we addressing the constitutional merits. *See Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir.1997) ("When the government classifies by gender, it must demonstrate that the classification is substantially related to an important governmental interest, requiring an 'exceedingly persuasive' justification."). *Cohen II* noted that the Policy Interpretation furthered the "clearly important" objectives of "avoid[ing] the use of federal resources to support discriminatory practices, and provid[ing] individual citizens effective protection against those practices." 101 F.3d at 184 (citation and internal quotations omitted). Moreover, it found that "judicial enforcement of federal anti-discrimination statutes is at least an important governmental objective." *Id.* And *Cohen II* held that the district court's relief, which was essentially identical to what the OCR Policy Interpretation calls for, was "clearly substantially related" to these objectives. *Id.* Along the same lines, the Seventh Circuit has held that "the remedial scheme established by Title IX and the applicable regulation and policy interpretation are clearly substantially related to" the objective of prohibiting "educational institutions from discriminating on the basis of sex." *Kelley*, 35 F.3d at 272. We adopt the reasoning of *Cohen I*, *Cohen II*, and *Kelley*, and hold that the constitutional analysis contained therein persuasively disposes of any serious constitutional concerns that might be raised in relation to the OCR Policy Interpretation.[8] The district court's

---

**8.** The amicus brief filed by USA Wrestling and a number of other organizations repeatedly invokes the *Adarand Constructors v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) line of cases and Title VII precedents to suggest that the scope of remedial action to

correct for disparities among groups is quite limited. Those precedents are not relevant in the context of collegiate athletics. Unlike most employment settings, athletic teams are gender segregated, and universities must decide beforehand how many athletic opportu-

 

final basis for rejecting the OCR's interpretation of Title IX was therefore erroneous.

### IV.

This past summer, 90,185 enthusiastic fans crowded into Pasadena's historic Rose Bowl for the finals of the Women's World Cup soccer match. An estimated 40 million television viewers also tuned in to watch a thrilling battle between the American and Chinese teams. The match ended when American defender Brandi Chastain fired the ball past Chinese goalkeeper Gao Hong, breaking a 4–4 shootout tie. *See* Grant Wahl, *Out of this World with the Cup on the Line, A Last–Second Hunch and a Clutch Left Foot Lifted the U.S. to a Breathtaking Victory over China, Sports Illustrated,* July 19, 1999, at 38. The victory sparked a national celebration and a realization by many that women's sports could be just as exciting, competitive, and lucrative as men's sports. And the victorious athletes understood as well as anyone the connection between a 27–year–old statute and tangible progress in women's athletics. *See* Scott M. Reid, *Title IX Scores Big for U.S. Soccer, Orange County Reg.,* July 6, 1999, at D1 (quoting Chastain's statement that "all of this is because of Title IX"); Patrick Hruby, *On Top of the World Scurry Saves Day, Chastain Wins It for U.S., Wash. Times,* July 11, 1999, at A1 (quoting defender Kate Sobrero's statement that "we're all Title IX babies, and this shows it's working"). Title IX has enhanced, and will continue to enhance, women's opportunities to enjoy the thrill of victory, the agony of defeat, and the many tangible benefits that flow from just being given a chance to participate in intercollegiate athletics. Today we join our sister circuits in holding that Title IX does not

bar universities from taking steps to ensure that women are approximately as well represented in sports programs as they are in student bodies. We REVERSE, and VACATE the preliminary injunction.

---

nities they will allocate to each sex. As a result, determining whether discrimination exists in athletic programs *requires* gender-conscious, group-wide comparisons. Because men are not "qualified" for women's teams (and vice versa), athletics require a gender conscious allocation of opportunities

in the first instance. The paradigm that has motivated the Supreme Court's more recent reverse-discrimination jurisprudence simply does not fit the case at bar. *See Cohen II,* 101 F.3d at 181 ("[W]hile *Adarand* does make new law, the law it makes is wholly irrelevant to the disposition of this appeal. . . .").