*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2002 FED App. 0306P (6th Cir.)
File Name:  02a0306p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

| | |
|---|---|
| MIAMI UNIVERSITY WRESTLING CLUB; MIAMI UNIVERSITY SOCCER CLUB; MIAMI UNIVERSITY TENNIS CLUB; MICHAEL AMBROSE; NATHAN STUDNEY; CHRISTOPHER TANGEN; TERRENCE WRIGHT; RYAN PALLINGER; SHAUN SOUCIE; JASON MURPHY; NICHOLAS BINGE; STEVEN MARIO CONTARDI; WILLIAM S. BLOOM, *Plaintiffs-Appellants,* <br><br> *v.* <br><br> MIAMI UNIVERSITY; JAMES C. GARLAND; JOEL MATURI; WAYNE R. EMBRY; RICHARD FARMER; ROGER L. HOWE; ELEANOR B. IRWIN; FRED LICK, JR.; LAUREL PRESSLER; KATHLEEN M. ZOUHARY; CHANDRA R. SHAH; FRED G. | No. 01-3182 |

WALL, in their official
capacities,
         *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00972—Sandra S. Beckwith, District Judge.

Argued: August 7, 2002

Decided and Filed: September 9, 2002

Before: SUHRHEINRICH and BATCHELDER, Circuit
Judges; LITTLE, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**    Michael  E.  Rosman,  CENTER  FOR
INDIVIDUAL RIGHTS, Washington, D.C., for Appellants.
James A. Dyer, SEBALY, SHILLITO & DYER, Dayton,
Ohio, for Appellees. **ON BRIEF:** Michael E. Rosman,
CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C.,
Robert R. Furnier, Todd J. Flagel, FURNIER & THOMAS
LLP, Cincinnati, Ohio, for Appellants. James A. Dyer, Kevin
A. Bowman, SEBALY, SHILLITO & DYER, Dayton, Ohio,
Robin L. Parker, MIAMI UNIVERSITY, Oxford, Ohio, for
Appellees.

---

[*] The Honorable F.A. Little, United States District Judge for the
Western District of Louisiana, sitting by designation.

plaintiffs' Title IX claim and the denial of the plaintiffs'
motion for reconsideration of that order.

**CLASS CERTIFICATION**

The plaintiffs claim that the district court's decision to hold
their motion for class certification in abeyance until the
parties had concluded discovery and the court had ruled on
the defendants' motion for summary judgment violated the
requirement of Federal Rule of Civil Procedure 23(c)(1) that
"[a]s soon as practicable after the commencement of an action
brought as a class action, the court shall determine by order
whether it is to be so maintained." Ultimately, when the
district court granted the defendants' motion for summary
judgment, it also denied as moot all other pending motions,
including the plaintiffs' motion for class certification.

We have consistently held that a district court is not
required to rule on a motion for class certification before
ruling on the merits of the case. *Sprague*, 133 F.3d at 397;
*Jibson v. Mich. Educ. Ass'n-NEA*, 30 F.3d 723, 734 (6th Cir.
1994).   Accordingly, we hold that the district court did not
abuse its discretion in ruling first on the merits of the
plaintiffs' claims before addressing the plaintiffs' motion for
class certification.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** in its entirety the
judgment of the district court.

based upon our review of the regulations, the Policy Interpretation and established law, that neither the regulations nor the Policy Interpretation are unreasonable, arbitrary, capricious, or manifestly contrary to Title IX. *See Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1045-47 (8th Cir. 2002); *Neal v. Bd. of Trustees of the Cal. State Univs.*, 198 F.3d 763, 769-72 (9th Cir. 1999); *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 637-38 (7th Cir. 1999); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 274-75 (6th Cir. 1996); *Cohen v. Brown Univ.*, 101 F.3d 155, 172-73 (1st Cir. 1996); and *Kelley*, 35 F.3d at 270-71. Accordingly, we defer to the 1979 Policy Interpretation.

### B. Stating a Claim Under Title IX

The plaintiffs contend that because Miami considered gender when it made the decision to eliminate the men's athletic programs, the elimination of those programs was discriminatory and violated Title IX. We conclude, however, that the plaintiffs have failed to state a claim under Title IX.

There is no constitutional right to participate in intercollegiate athletics. *Burrows v. Ohio High Sch. Athletic Ass'n*, 891 F.2d 122, 125 (6th Cir. 1989). Title IX prohibits gender inequity in connection with, among other things, the opportunity to participate in athletics. The statute focuses on opportunities for the underrepresented gender, and does not bestow rights on the historically overrepresented gender, *Cohen*, 101 F.3d at 174; *Neal*, 198 F.3d at 770; and it is well-established that classification by gender is not a per se violation of Title IX, *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 697 (6th Cir. 2000). Moreover, as the district court recognized, the plaintiffs have not alleged that Miami failed to provide equal athletic opportunities by gender, and, in fact, the plaintiffs' complaint is that Miami brought its athletic programs into compliance with Title IX, and equalized the athletic opportunities for men and women by eliminating the men's team sports at issue here. Accordingly, we affirm both the order of the district court dismissing

## OPINION

ALICE M. BATCHELDER, Circuit Judge. The plaintiffs appeal the district court's orders granting summary judgment in favor of the defendants on the plaintiffs' equal protection claim, dismissing the plaintiffs' Title IX claim and denying the plaintiffs' motion for class certification. We find that the plaintiffs wholly failed to state either an equal protection claim or a claim under Title IX, and that the district court's denial of the motion for class certification was within the court's sound discretion. We will therefore affirm the judgment dismissing this action.

## PROCEDURAL HISTORY

On November 18, 1999, the plaintiffs[1] filed a complaint against the defendants,[2] claiming that the defendants' elimination of the men's wrestling, tennis and soccer programs at Miami University [hereinafter "Miami"], a state university of the State of Ohio and a recipient of federal funds, constituted gender discrimination in violation of 20 U.S.C. § 1681 *et seq.* and violated their rights to equal protection under the Fourteenth Amendment. An amended complaint filed shortly thereafter named as plaintiffs a class

---

[1]The plaintiffs include Miami University Wrestling Club; Miami University Soccer Club; Miami University Tennis Club; wrestlers Michael Ambrose, Nathan Studney, Christopher Tangen, Terrence Wright and Ryan Pallinger; soccer players Shaun Soucie, Jason Murphy, Nicholas Binge and William S. Bloom; and tennis player Steven Mario Contardi.

[2]The defendants include Miami University; the individual members of Miami's Board of Trustees: Wayne R. Embry, Richard Farmer, Roger L. Howe, Eleanor B. Irwin, Fred Lick, Jr., Laurel Pressler, Kathleen M. Zouhary, Chandra R. Shah and Fred G. Wall; President James C. Garland; and Athletic Director Joel Maturi, all in their official capacities only.

consisting of all male students who had enrolled in Miami with the expectation that they would be able to compete in wrestling, tennis or soccer and future male students at Miami who wanted to compete in those sports.

The claims in both complaints were identical: they alleged first, that by eliminating the men's wrestling, tennis and soccer programs because of the gender of the participants, the defendants discriminated against the plaintiffs on the basis of sex, excluded them from participation in educational programs because of their sex, and denied them the benefits of educational programs because of their sex, in violation of Title IX and its implementing regulations, 34 C.F.R. § 106 *et seq.*; and second, that the individual defendants, while acting under color of state authority, denied the plaintiffs the equal protection of the laws in violation of the Equal Protection Clause and 42 U.S.C. § 1983 by eliminating the sports programs on the basis of the gender of the participants. The plaintiffs requested declaratory and injunctive relief, compensatory damages and the reinstatement of those programs.

The defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion in part and denied it in part, dismissing the Title IX claim against all of the defendants and the equal protection claim against Miami only, directing that it would proceed with the equal protection claims against the individual defendants for injunctive and declaratory relief pursuant to § 1983.

Meanwhile, the plaintiffs filed a motion for class certification and a second amended complaint, which was identical to the first amended complaint but for the addition of an alternative due process claim. The district court remanded the case to a magistrate judge for reevaluation of the parties' discovery needs in light of the order for partial dismissal, but advised that it intended to hold the motion for class certification in abeyance until it had considered a motion

regard to those issues, including the level of scrutiny required in reviewing a claim of sex discrimination.

## TITLE IX CLAIM

With respect to their Title IX claim, the plaintiffs contend that: (1) the 1979 Policy Interpretation is not entitled to deference; (2) even if the Policy Interpretation is entitled to some deference, it is not a persuasive interpretation of Title IX; and (3) the amended complaint stated a claim of violation of Title IX. We think the plaintiffs are incorrect on each contention.

### A. Deference to the 1979 Policy Interpretation

Consistent with the precedent of this court and various other courts, we conclude that the Policy Interpretation is entitled to deference. Despite the plaintiffs' assertions to the contrary, the facts in *Christensen v. Harris County*, 529 U.S. 576 (2000), are distinguishable from the facts at issue here. The *Christensen* court specifically dealt with an interpretation contained in an opinion letter, "not one arrived at after . . . a formal adjudication or notice-and-comment rulemaking." 529 U.S. at 587. It is clear that the 1979 Policy Interpretation is far more than a mere opinion letter. Before it was published, a formal comment period was held and over 700 comments were received. 44 Fed. Reg. 71,413. HEW staff also visited eight universities to see how the policy would apply in practice. *Id.* We conclude that the *Christensen* "respect only" interpretation is not applicable to the Policy Interpretation. Rather, "[b]ecause Congress has not 'directly spoken to the precise question at issue,' we must sustain the Secretary's approach so long as it is 'based on a permissible construction of the statute.'" *Auer v. Robbins*, 519 U.S. 452, 457 (1997) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., et al.*, 467 U.S. 837, 842-843 (1984)). The regulations and their interpretation should be accorded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. We find,

swimming program at the University of Illinois alleging violations of Title IX and the Equal Protection Clause for the termination of the men's swimming program:

> Plaintiffs' final argument is that the defendants' decision to eliminate the men's swimming program while retaining the women's program denied them equal protection of law as guaranteed by the Fourteenth Amendment. We do not agree. First, the record makes clear that the University considered gender solely to ensure that its actions did not violate federal law. And insofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiffs' attack on those actions is merely a collateral attack on the statute and regulations and is therefore impermissible. *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 424 (7th Cir.1991), certiorari denied, 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991).

*Kelley v. Bd. of Trustees*, 35 F.3d 265, 272 (7th Cir. 1994).

In the case before us today, it is evident that Miami took the challenged actions in an attempt to comply with the requirements of Title IX, and, as we explain below, Miami was successful in that attempt. Only if Title IX, its regulations or the Policy Interpretation are unconstitutional—an issue not before us in this lawsuit—could we hold that Miami's compliance with the law and the regulations is unconstitutional.

Accordingly, we hold that the plaintiffs' claim is a collateral attack on the constitutionality of Title IX, the regulations and the Policy Interpretation, and that the plaintiffs have failed to state an equal protection claim under either the Fourteenth Amendment or the Fifth Amendment. We therefore need not address any of the additional arguments raised by the parties and discussed by the district court with respect to this claim. We express no opinion with

for summary judgment to be filed by the individual defendants on the sole remaining equal protection claim. Upon the completion of the limited discovery allowed by the magistrate judge, the plaintiffs moved for reconsideration of the order dismissing the Title IX claim.

After the individual defendants filed the anticipated motion for summary judgment, the district court issued a memorandum and order granting the summary judgment motion and denying the motion for reconsideration. It also denied as moot all other pending motions, including the plaintiffs' motion for class certification. This timely appeal followed.

### STATEMENT OF FACTS

In 1984, the Office of Civil Rights ("OCR"), which enforces Title IX, conducted a comprehensive review of Miami in response to a complaint filed with that office alleging that Miami discriminated against women in the opportunity to receive coaching and in the accommodation of student interests and abilities. The OCR determined that the "rates of participation in athletics [did] not correspond to the percentage of male and female students," but that the proposed addition of women's sports such as cross country would address this problem.

In 1993, Miami conducted a Title IX self-evaluation, and in 1994, a task force issued a report and recommendation regarding intercollegiate athletics, which revealed that in 1993, females constituted fifty-four percent of the Miami student body, while they contributed only twenty-nine percent of Miami's student-athletes. While female athletic teams were added between 1993 and 1997, female students, who comprised fifty-five percent of Miami's undergraduate population in 1997, contributed only forty-two percent of its student-athletes. In twenty-five years, Miami had added only four female varsity teams, and there was unmet female interest in equestrian, crew, golf, lacrosse and water polo.

Moreover, Miami spent proportionally more on male than female athlete recruiting and financial aid.

In light of those statistics and the lack of additional funds to increase athletic opportunities for female students, Miami's Athletic Policy Committee concluded, with the assistance of Lamar Daniel, Inc., an independent consultant which conducted a study and formulated a compliance plan in 1996-97, that in order to comply with Title IX, the university would need to eliminate some athletic opportunities for male students. After rejecting all alternatives, Miami's President, James Garland, and Athletic Director, Joel Maturi, recommended to the Miami Board of Trustees [hereinafter "Trustees"] the elimination the men's golf, soccer, tennis and wrestling teams as of the end of the 1998-99 academic year. On April 16, 1999, the Trustees, unable to identify other viable options, voted to eliminate the men's soccer, tennis and wrestling teams. Men's golf ultimately was not cut because the participants and alumni raised sufficient funds to support the program without Miami's financial assistance.

The immediate effects of the Trustees' actions were the loss of athletic opportunities for the members of the men's soccer, tennis and wrestling teams and an increase in the female student-athlete percentage. During the 1999-2000 academic year, females constituted fifty-five percent of Miami's student body and fifty-three percent of its student athletes. Miami also increased the budget for financial aid to female students by $400,000.

## HISTORY OF TITLE IX

### A.  Title IX

Title IX was enacted as part of the Education Amendments of 1972, Pub. L. 92-318, §§ 901-05, 86 Stat. 373-75 (codified at 20 U.S.C. § 1681 *et seq.* (1972)), and was modeled after Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d-7. 118 Cong. Rec. 5802, 5807 (Feb. 28, 1972) (Sen. Bayh); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 529

of fact. *Schachner v. Blue Cross & Blue Shield of Ohio,* 77 F.3d 889, 895 (6th Cir. 1996). We will not find an abuse of discretion unless we have a "definite and firm conviction that the trial court committed a clear error of judgment." *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996).

## EQUAL PROTECTION CLAIM

The plaintiffs claim that in making and implementing the decision to comply with the requirements of Title IX by eliminating the men's wrestling, tennis and soccer programs at Miami, the defendants, acting under color of law, denied the plaintiffs the equal protection of the law. They further argue that this claim is not a collateral attack but a direct attack on the constitutionality of Title IX, the regulations and the Policy Interpretation. We find no merit to this argument. Nothing in any version of the complaint can be construed as a direct challenge to either the law, the regulations or the Policy Interpretation. At oral argument, plaintiffs contended that even if the complaint did not expressly state such a challenge, the briefs before the district court did. Notwithstanding our view that the basis of plaintiffs' claim must be clearly expressed in the complaint, we have carefully reviewed those briefs—which were not included in the Joint Appendix—and find no such challenge expressed there either.

As we understand the plaintiffs' argument it is, first, that the defendants acted under color of state law in eliminating these men's sports, and that these actions were in violation of Title IX and denied the plaintiffs equal protection in violation of the Fourteenth Amendment; and second, even if the defendants' actions did not violate Title IX—and therefore, they acted pursuant to federal law rather than under color of state law—those actions were in violation of the equal protection component of the Fifth Amendment's due process clause.

The Seventh Circuit addressed an almost identical argument in an action brought by members of the men's

resources, this approach may be the only way for an educational institution to comply with Title IX while still maintaining the other niceties of its mission, such as its academic offerings.

## ANALYSIS

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, using the same standard under Rule 56(c) used by the district court. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

We review a district court's decision on a motion for class certification under Federal Rule of Civil Procedure 23 for an abuse of discretion. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). A district court abuses its discretion when it applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings

(1982). With some exceptions not relevant here, section 901(a) provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

### B. 1975 Implementing Regulations

Section 902 authorizes and directs each Federal department empowered to extend Federal financial assistance to issue implementing rules and regulations. 20 U.S.C. § 1682. Two years after Title IX was enacted, Congress directed the Secretary of the Department of Health, Education, and Welfare (HEW)[3] to prepare and publish regulations implementing the provisions of Title IX. Pub. L. 93-380, 88 Stat. 484, 612 (1974). After consideration of the over 9,700 comments HEW received regarding its proposed regulations, HEW published a final rule implementing Title IX on June 4, 1975. 40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. § 86.1). The final regulations became effective on July 21, 1975. 40 Fed. Reg. at 24,128, 24,137.

The regulations provide that

[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a

---

[3]In 1980, HEW was split into two agencies, and the Office of Civil Rights for the new Department of Education ("DOE") assumed responsibility for administration of Title IX. 20 U.S.C. §§ 3413(a), 3441(a)(3); *Cohen v. Brown Univ.*, 101 F.3d 155, 165 n.5 (1st Cir. 1996). The DOE established a new Title 34 in the Code of Federal Regulations which recodified the implementing regulations of Title IX; the regulation governing athletics changed from 45 C.F.R. § 86.41 to 34 C.F.R. § 106.41. 45 Fed. Reg. 30,802 (May 9, 1980).

recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a). Further, they require that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." § 106.41(c). Determinations of equal opportunities include, among nine other factors not relevant here, consideration of "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." § 106.41(c)(1).

### C.  1979 Policy Interpretation

In 1978, HEW, to encourage self-policing, issued a Proposed Policy Interpretation and solicited public comment. 43 Fed. Reg. 58,070, 58,071 (Dec. 11, 1978). HEW had received ninety-three complaints against at least sixty-two colleges following the expiration of the three-year phase-in period provided for in the regulations, so it designed the Policy Interpretation to "provide a framework within which those complaints [could] be resolved, and to provide institutions of higher education with additional guidance on the requirements of the law relating to intercollegiate athletic programs." *Id*.

Following the publication of the proposed Policy Interpretation, HEW received over 700 comments and visited eight universities to see how the proposed policy and other suggested alternatives would apply in practice. 44 Fed. Reg. 71,413, 71,413 (Dec. 11, 1979). On December 11, 1979, HEW published a final Policy Interpretation, which clarified the meaning of "equal opportunity" in intercollegiate athletics and explained the factors considered when determining compliance. *Id*. at 71,414.

According to the Policy Interpretation, HEW will find that an institution has effectively accommodated the interests of

its male and female students if it satisfies any one part of a three-part test:

(1)  Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.[4]

44 Fed. Reg. at 71,418.

The Policy Interpretation implicitly recognizes that universities and other recipients of federal funds do not have infinite money supplies. If a university cannot afford to add sports teams in order to provide equal athletic opportunity for men and women, it may be forced to subtract in order to equalize. It is anomalous in an allegedly free society to accomplish equality of opportunity by decreasing rather than increasing opportunities, but in the real world of finite

---

[4]On January 16, 1996, the DOE issued the "Clarification of Intercollegiate Athletics Policy Guidance:  The Three-Part Test," which emphasized that the substantial proportionality element of the first prong is a "safe harbor," noted that strict numerical formulas are not required, and recognized that the focus is on the underrepresented sex.